Irma S. WOFFORD et al., Plaintiffs,

v.

SAFEWAY STORES, INC., et al., Defendants.

Mary TRAYLOR et al., Plaintiffs,

v.

SAFEWAY STORES, INC., et al., Defendants.

Mary C. MILTON, Plaintiff,

v.

SAFEWAY STORES, INC., Defendant.

Nos. C–74–300–CBR, C–74–2575–CBR and C–75–1236–CBR.

United States District Court, N. D. California.

April 11, 1978.

---

**64.** Thus the Court finds it unnecessary to evaluate plaintiff's affidavit on this point. *See* Doc. 15, at 23–26.

Roger A. Clay, Jr., Eric Gold, Henry Hewitt, Oakland, Cal., Legal Aid Society of Alameda County, for plaintiffs Milton and Traylor.

Edward H. Lyman, Ballachey, Meade, Duane & Lyman, Berkeley, Cal., George Todd Withy, Kelley Ann Burg, Withy, Gould, Miller & Gerstler, Berkeley, Cal., for plaintiff Traylor.

Pillsbury, Madison & Sutro, William L. Diedrich, Jr., Joe C. Creason, Jr., Paul B. Johnson, San Francisco, Cal., for defendant Safeway Stores, Inc.

Thornton C. Bunch, Jr., Bunch & White, San Francisco, Cal., for defendant Local 1179.

Barry S. Jellison, Davis, Cowell & Bowe, San Francisco, Cal., for defendant Local 870.

Solomon Zeltzer, San Jose, Cal., Theodore G. Smith, Smith, Johnson, Fogel & Ramo, San Jose, Cal., for plaintiff Wofford.

## MEMORANDUM OF OPINION

RENFREW, District Judge.

Pursuant to Rule 23(c)(1) of the Federal Rules of Civil Procedure, plaintiffs have moved for a determination that these consolidated employment discrimination suits may be maintained as a class action. At the same time, defendant Safeway Stores, Inc. ("Safeway"), has moved for summary judgment against plaintiff Steven Smith in *Traylor v. Safeway,* No. C–74–2575–CBR. Argument on the motions were heard July 21, 1977. For the reasons set forth below, both motions will be granted. With respect to plaintiffs' motion, however, careful consideration of the requirements of Rule 23 of the Federal Rules of Civil Procedure as applied to the facts alleged and shown here has convinced the Court that the class must be more narrowly drawn than plaintiffs propose.

## I. THE SUMMARY JUDGMENT MOTION

In October, 1973, Steven Smith applied for a job with Safeway as an industrial relations representative. His claim arises from his failure to obtain that job. It is undisputed that Safeway at that time had a single opening for an industrial relations representative; that Smith, a Black male, was interviewed for that job by three members of Safeway management, including one Black; that he had a beard at the time of the interview; that he was not hired by Safeway; that Safeway continued to consider applicants after his interview and later (but well before Smith made any complaint) hired a Black male, Willie Green, for the job; that Green was the first Black hired into the industrial relations department; and that no industrial relations representative employed by Safeway now or at the time of Smith's application has or at that time had a beard.

As to the remaining facts, the parties are not fully in agreement. Plaintiff Smith's version of the events is as follows. During the interview, he informed the Safeway managers that his beard was an important part of his racial identity. In response, they stated that there was no company policy against beards, and that at least one white Safeway employee had a beard. He was told, however, that shaving his beard might facilitate entrance into this job. As he was leaving the building following the interview, he was offered the job, provided he shaved his beard. In two subsequent conversations with individual interviewers, that position was maintained. Safeway denies this version and maintains that after his initial interview, Smith was asked to contact Safeway again within a few days. He failed to do so and showed no further interest in the position.

Assuming plaintiff's version is what actually transpired, the Court finds that Safeway is entitled to judgment as a matter of law. Where easily changed physical characteristics are made the basis for an individual's racial identity, it is simply not the law that "an *asserted* racial or cultural identity cannot legally be the basis for denial of employment." Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment, filed July 11, 1977, at 5–6 (emphasis supplied). Facial hair is not an "immutable or protected characteristic" for purposes of any law barring discrimination in employment. *Thomas v. Firestone Tire and Rubber Company,* 392 F.Supp. 373, 375 (N.D.Tex.1975). Thus it can legally be made the basis for distinctions in the application of employment practices. *Ibid.; cf. Willingham v. Macon Telegraph Publishing Co.,* 507 F.2d 1084, 1092 (5 Cir. 1975) *(en banc); Baker v. California Land Title Company,* 507 F.2d 895, 897 (9 Cir. 1974), *cert. denied,* 422 U.S. 1046, 95 S.Ct. 2664, 45 L.Ed.2d 699 (1975); *Fagan v. National Cash*

*Register Company,* 157 U.S.App.D.C. 15, 24–25, 481 F.2d 1115, 1124–1125 (1973). Accordingly, even-handed application of reasonable grooming regulations has uniformly been held not to constitute discrimination on the basis of race within the meaning of either Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* or the Civil Rights Act of 1866, 42 U.S.C. § 1981. *Brown v. D.C. Transit System, Inc.,* 173 U.S.App.D.C. 130, 133–134, 523 F.2d 725, 728–729 (1975); *Smith v. Delta Air Lines, Inc.,* 486 F.2d 512, 514 (5 Cir. 1973); *Thomas v. Firestone Tire and Rubber Company, supra,* 392 F.Supp. at 375. Such regulations have been found non-discriminatory even where Black plaintiffs invoked facial hair as their "racial identity." *Brown v. D.C. Transit System, Inc., supra,* 173 U.S.App.D.C. at 131, 523 F.2d at 726; and even where the regulation could place an additional burden on Black persons, *Smith v. Delta Air Lines, Inc., supra,* 486 F.2d at 514.

A company cannot legally use grooming regulations as a pretext for refusal to hire Black applicants. *See Fagan v. National Cash Register Company, supra,* 157 U.S.App.D.C. at 25, 481 F.2d at 1125. And it would, of course, violate Title VII to enforce such regulations against Blacks but not whites. But the undisputed facts do not establish that either of these things has occurred in this case.

Nothing in Smith's allegations remotely suggests that Safeway's concern about his beard was pretextual. Smith does not question the legitimacy of Safeway's stated reasoning that a bearded industrial relations representative could have encountered difficulties in dealing with union personnel. By his own account, he was offered the job, but chose not to accept it if it meant shaving his beard. And the job ultimately went to another Black applicant, a factor which undermines the allegation of discriminatory intent. *See Blunt v. Watson Chapel School Dist.,* 10 F.E.P. Cases 1049, 1050 (E.D.Ark.1974). The fact that an employee charging discrimination was replaced with an individual of the same race may not rebut a prima facie showing of discrimination. This is so because in some circumstances the selection of the replacement may have been to cover up or conceal the discrimination. However, such evidence is clearly relevant and supports a nondiscriminatory purpose. *See Equal Employment Opportunity Com'n v. Tufts Inst.,* 421 F.Supp. 152, 164–165 (D.Mass.1975); *Townsend v. Exxon Co., U.S.A.,* 420 F.Supp. 189, 193 (D.Mass.1976). Here, there has not even been a prima facie showing of discrimination. The ultimate hiring of a Black, together with the earlier offer to Smith conditioned on an act within his power, are sufficient as a matter of law to negate the bare assertion that Safeway's invocation of a facially nondiscriminatory grooming standard was a pretext for race discrimination.

With respect to disparate application, Smith argues that there is no company-wide policy barring beards, that even the industrial relations department has no such policy in written form, and that other Safeway employees have beards. But Smith does not controvert Safeway's assertion that the particular position applied for required unusually conservative grooming. It is undisputed that no employee in that position, from the time of plaintiff's application to the present, has had a beard. Plaintiff has not alleged that any employees in similarly sensitive positions are permitted to have beards, and the mere failure to establish a written, company-wide grooming policy does not in itself suggest disparate application. The unwritten policy here, though informal and limited to one position, is clearly designed to further the company's legitimate interests. Reasonable grooming requirements in those interests fall within the ambit of managerial discretion. *Brown v. D.C. Transit System, Inc., supra,* 173 U.S.App.D.C. 133, 523 F.2d at 728; *Fagan v. National Cash Register Company, supra,* 157 U.S.App.D.C. at 24–25, 481 F.2d at 1124–1125. In the absence of an allegation that the impact of the policy falls unevenly on persons similarly situated, this Court cannot say that its scope, form, or manner of adoption were improper.

In short, Smith has shown no more than the even-handed application of a legitimate grooming rule. Even accepting his version of the facts, the company was entitled to put him, like any otherwise qualified applicant, to the choice: job or beard. Having elected to keep his beard, he is now in no position to complain.

## II. THE CLASS ACTION DETERMINATION

### A. *Factual Background*

These actions are brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, by ten named plaintiffs [1] who seek injunctive, declaratory, and monetary relief for discriminatory employment practices allegedly engaged in by Safeway. They originally moved for a determination that the actions may be maintained on behalf of a class against both Safeway and the union defendants. They now concede, however, that the relevant collective bargaining agreements have little or no impact on the challenged policies.[2] Accordingly, they seek to proceed as a class against Safeway alone.

Plaintiffs allege that Safeway has discriminated against women, Blacks, Hispanics, Asians, and Native Americans in recruiting, hiring, non-performance-related job requirements, terminations, training, promotion, and job assignment. In addition, they claim that Safeway has harassed minority employees and refused to take reasonable steps to eliminate the effects of past discrimination. The proposed class would consist of all women, Blacks, Hispanics, Asians, and Native Americans [3] who have applied for employment, or who are past, present, or future employees in Safeway's San Francisco Retail Division stores (excluding meat department employees) or administrative headquarters, its national administrative headquarters ("corporate headquarters"), or the administrative offices of the Produce, Brookside, or Brands Buying Divisions of its national supply organization ("supply divisions"). Plaintiffs further propose that the class be divided into subclasses to correspond to these three organizational units.

Although the parties seriously dispute the proper characterization to be placed on the basic facts, there is no real disagreement as to the general organization and operating procedures in use within the three proposed subclass units.

The San Francisco Retail Division, one of 21 such divisions in the United States, consists in relevant part of an administrative headquarters located in Fremont, California, and over 200 retail stores in an area running from the Oregon border south to King City, California, and from the Pacific Coast inland approximately 35 miles. The division is headed by a division manager, and is divided into 3 retail operations areas headed by retail operations managers. These officials work out of the Fremont office, which also employs approximately 325 employees in 25 departments which provide support services for retail operations. The departments include, for example, equipment and maintenance, design, advertising, real estate, public relations, auditing, and employee relations. The employee relations department asserts varying degrees of control and coordination in personnel services for the entire division, including hiring, promotion, administration of collec-

---

1. Plaintiffs represent that a settlement has been worked out between defendant and an eleventh plaintiff, Larkin Wade. Therefore plaintiff Wade is no longer seeking to represent the class. Plaintiffs' Reply Memorandum filed July 12, 1977, at 29 n. 23.

2. The Court notes that this concession, made first in plaintiffs' reply brief and after almost three years of litigation, appears to undermine any claim for relief against the union. An earlier decision on this point and the probable dismissal of the union would have been to the

best interests of all in directing the resources of the parties to matters of legitimate dispute.

3. While the complaints herein speak to these designated groups, the opening memorandum in support of class certification refers to "all women and minorities, including Blacks, Hispanics, Asians and Native Americans." For the purposes of this Memorandum of Opinion, the allegations of the complaints establish the outside perimeters of the classes sought to be established.

tive bargaining agreements, and the administration of the Retail Management Training Program ("RMTP"). A central file of employee records is maintained at this office, although principal records are kept on file at local stores and district offices.

For purposes of store operations, the division is divided into 15 districts (excluding Hawaii, which plaintiffs do not seek to represent here), each of which contains 10 to 15 retail stores and is directed by a district manager working from a local district office. Within each store there are 4 to 5 management jobs relevant to this suit (store manager, assistant manager or managers, produce manager, and "third person" —an informal management trainee who is essentially a relief assistant manager) and two entry level jobs (food clerk or "checker" and courtesy clerk or "bagger"). All but the store manager belong to locals of the International Retail Clerks Union. Hiring into clerk positions is done by the central employee relations department, and all new food clerks must complete one week of training at a training center in Oakland. The responsibility for subsequent personnel decisions and programs is more fragmented. Specific decisions regarding job assignments, work schedules, training, selection for entry into RMTP, discipline, and termination (other than store managers) are made by the individual store manager, sometimes in conjunction with his district manager. However, all these decisions are made within a framework of policies and procedures that is uniform throughout the division. Transfers from one store to another are permitted. If an employee transfers out of the jurisdiction of his union local, he loses seniority protection for 6 months. However, the union locals' jurisdictional lines do not correspond to district boundaries.

There is a single affirmative action plan for the division, with subparts for each district. Under-utilization analyses, goals and timetables for each district are set at the division level, and cannot be changed by lower management personnel for the area within their authority. The plan is administered and implemented by district and store managers, but their efforts are coordinated and their progress monitored by the division's affirmative action committee.

Policies, procedures and standards for promotion are uniform throughout the division. With the exception of produce managers, management personnel are drawn from among food clerks in the following way. The store and district manager jointly select employees with management potential to enter RMTP, a program of rotation through various jobs and departments in different stores over a period of two or more years. The actual transfers, job assignments, and training are handled by district and store managers and monitored at the division level. Selection of employees for promotion up to the level of store manager is done by the store and district managers, subject to review by retail operations managers in some cases. The qualifications for selection for both training and promotion are unwritten and subjective. Vacancies are not posted and seniority is not a factor.

Third persons are selected from among food clerks in the store where the vacancy occurs. Higher level management vacancies are apparently filled from the ranks of managers throughout the division, although selection from another union local would result in loss of seniority protection for all but store managers. There is no indication of the actual extent of promotion across district lines. Produce managers are selected in the same way, but are generally drawn from among produce managers at smaller stores, or from among employees who have expressed an interest in produce instead of the usual RMTP and have been assigned to that department exclusively.

Management positions above the level of store manager are filled primarily through promotions, and Safeway operates a national management development training program for employees at or above the level of store manager, for which individuals are recommended by the division manager. However, fewer than half of the current officials and managers at the Fremont of-

fice were promoted from within the division.

The corporate headquarters, located principally in various offices in Oakland, California, employs 843 employees in 51 departments and service divisions of a widely varying nature, providing all the professional and technical support services necessary to the operating divisions. The workforce consists primarily of approximately 15% officials and managers, 40% professionals, and 40% office and clerical workers. Hiring into all these positions is a three-step process. The employee relations department recruits applicants internally, by posting, as well as outside the company. All applicants are screened by that department for basic qualifications, and two, three or possibly more qualified applicants are referred to the manager of the department where the vacancy is. Final selection is made by the department manager, with, on rare occasions, the consultation of the senior vice president for personnel. Department managers are responsible for promotions, discipline, and termination. Except for clerical personnel, there is little movement of employees from one department to another, either by promotion or transfer. However, a single affirmative action program governs the entire corporate headquarters.

The supply divisions provide procurement services for the retail divisions nationwide. Plaintiffs challenge employment practices in the administrative offices of three of the seven divisions. All three offices are located in the San Francisco Bay Area. The Brookside, Produce, and Brands Buying Divisions employ respectively 104, 51 and 122 individuals in numerous departments and job categories in the managerial, professional (except Produce), and clerical categories. Each division has responsibility for its own personnel matters, including administration of its own affirmative action program, and policy favors the filling of managerial and some professional positions by promotion or transfer. Beyond this, there is no evidence before the Court as to the employment practices of these divisions.

## B. *The Requirements of Rule 23*

### 1. *General Approaches*

This case presents a classic example of the clash between the Title VII plaintiff's "across-the-board" approach and the defendant's "divide and conquer" strategy. *See Harriss v. Pan American World Airways, Inc.*, 74 F.R.D. 24, 51 (N.D.Cal.1977). Neither provides an adequate approach to a class action determination. Plaintiffs here rely on numerous opinions that have exhorted courts to give Rule 23 a "liberal construction" in Title VII cases in order to effectuate the remedial policy of that act in light of the inherent class character of discrimination claims. *See Gay v. Waiters' and Dairy Lunchmen's Union*, 549 F.2d 1330, 1332–1334 (9 Cir. 1977), and cases cited therein. But few courts have taken the trouble to explain what this means in practice, and the Supreme Court's recent holding in *East Texas Motor Freight v. Rodriguez* makes it clear that the requirements of Rule 23 must be given careful attention in Title VII cases. 431 U.S. 395, 405–406, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977). *See also Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d 1304, 1312 (9 Cir. 1977). What then, does Title VII require?

 It is true that discrimination on the basis of race, sex, or national origin is by definition class discrimination, and that enforcement by individual plaintiffs acting as private attorneys general is essential to Title VII and should be encouraged. Thus, a class action may be maintainable to challenge a general course of discrimination, even though different members of the class may have been affected in different ways and at different times. *E. g., Gibson v. Local 40, Supercargoes & Checkers, etc.*, 543 F.2d 1259, 1264 (9 Cir. 1976); *Barnett v. W. T. Grant Company*, 518 F.2d 543, 548 (4 Cir. 1975). Moreover, the "Damoclean threat" of discrimination affecting every minority employee or job applicant provides common questions sufficient to satisfy Rule 23(a)(2) as to the class of individuals affected in the same way. *E. g., Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1124 (5 Cir. 1969).

These principles have led courts to permit the maintenance of across-the-board classes covering individuals whose race, job classification, place of employment, and claim for relief may vary substantially from those of the named plaintiffs. But they do not relieve the named plaintiffs of their burden of establishing compliance with each of the prerequisites of Rule 23(a) as well as one of the subcategories of Rule 23(b). *E. g., Doninger v. Pacific Northwest Bell, Inc., supra,* 564 F.2d at 1308–1309; *Senter v. General Motors Corp.,* 532 F.2d 511, 522 (6 Cir. 1976), *cert. denied,* 429 U.S. 870, 97 S.Ct. 1897, 50 L.Ed.2d 150 (1977).

That burden may be eased with respect to the requirements of commonality, Rule 23(a)(2), and action on grounds generally applicable to a class, Rule 23(b)(2), in that a proper preliminary showing of discrimination is sufficient to satisfy both as to the class of persons shown to have been affected. But a liberal interpretation of Rule 23 cannot mean a generalized rule that a court is to find that the named plaintiff is a member of a sufficiently numerous class, Rule 23(a)(1), that his claim is typical of the class, Rule 23(a)(3), or that he will adequately represent their interests, Rule 23(a)(4), in cases where it otherwise would not. To permit class treatment where joinder is practicable would simply make no sense as a matter of judicial administration. And it would unnecessarily endanger the interests of absent parties who could be given the opportunity to participate. Worse, a general loosening of the standards for membership in the class, typicality, and adequate representation would both endanger the interests of class members and jeopardize the very ends of eradicating class-based discrimination that a liberal interpretation is intended to further. The importance of this goal dictates that the class be limited to those employees whose interests the named plaintiff is likely to press with substantially equal vigor and ability. Any other interpretation could permit a well-intentioned plaintiff, who could ably represent a limited class, to bind a broad class of employees whose real interests he may have misinterpreted or unconsciously subordinated to his own, to a losing judgment or an unfavorable settlement. *See generally Johnson v. Georgia Highway Express, Inc., supra,* 417 F.2d 1122, 1126–1127 (Godbold, J., concurring). Given the subtle influence the representative plaintiff's viewpoint may have in shifting the focus of discovery and trial preparation, it is doubtful that a court could compensate for this effect even at trial. It would be impossible for the court to conscientiously approve a consent decree if it could not rely on the judgment of counsel and of the named plaintiffs in representing the interests of the class as a whole while trading benefits that might accrue to some class members at the expense of others during the course of a settlement.

A court should of course consider whether a particular ruling would undermine enforcement of Title VII, and particularized concerns unique to the employment discrimination context may dictate results in some instances. *E. g., Reed v. Arlington Hotel Co., Inc.,* 476 F.2d 721, 723 (8 Cir.), *cert. denied,* 414 U.S. 854, 94 S.Ct. 153, 38 L.Ed.2d 103 (1973) (terminated employees must be permitted to represent current employees in order to prevent employers' frustrating suit by discharging named plaintiffs). But the policies of Title VII itself dictate that the Court scrutinize the facts for compliance with these requirements of Rule 23 at least as carefully in employment discrimination as in other class actions. *See Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 38; *cf. Gibson v. Local 40, Supercargoes & Checkers, etc., supra,* 543 F.2d at 1264; *Wells v. Ramsay, Scarlett & Co.,* 506 F.2d 436, 437–438 (5 Cir. 1975).

Defendant's approach is equally inconsistent with the policies of Title VII and of Rule 23. Defendant invites the Court to find as a matter of law that a class can only include those other persons of the same minority group, holding the same type of job, working in the same facility, members of the same union local, and presenting the same type of claim as a named plaintiff.

Using these criteria to narrow the proposed class to a small subclass for each individual plaintiff, defendant concludes that there are substantial questions as to numerosity. This approach would of course soon reduce Rule 23 to a nullity. If accepted, it would undermine the enforcement of Title VII at least as much as would the overly broad approach advocated by plaintiffs. The inquiry cannot be directed solely to the obvious differences among various groups of employees, or to the fact that other courts may have found them significant in other situations. The real question is the precise nature of the differences raised by defendant and their effect on the requirements for maintenance of a class action as defined in Rule 23. Although neither party has provided a sufficient analysis of the facts with this in mind, the Court will attempt it. A great problem in any such effort is the substantial overlap among the subsections of Rule 23 and the confused state of the law as to what each requires. Although there is certainly room for other interpretations, this Court finds that the issues raised by Rule 23 in employment discrimination cases call for analysis in two general areas.

■■■■ The first is whether, in light of all the available facts as to defendant's employment structure, the policies challenged, and the group of potential claimants, the claims being raised by the named plaintiffs are the type of claims that call for class action treatment as a matter of judicial administration. A class action is a "procedural device for promoting the economic and efficient disposition of justiciable controversies, not a vehicle for an investigative proceeding." *Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 42; *see La Mar v. H & B Novelty & Loan Company,* 489 F.2d 461, 463–464 (9 Cir. 1973). Thus, Rules 23(a)(1) and (2) require a finding that the named plaintiffs are members of an identifiable class, raising questions sufficiently similar to all members of the class to permit efficient adjudi-

cation on a class basis (questions generally provided by defendant's action on grounds generally applicable to the class as required by Rule 23(b)(2)), and that the class is sufficiently numerous to justify the effort.

■■■■ Second, can these particular plaintiffs, given the circumstances in which their individual claims arose, adequately present the claims of any or all members of the class which appear desirable from a judicial point of view? These are the requirements of typicality and adequacy of representation, Rules 23(a)(3) and (4). Adequate representation goes to the heart of the problem of binding class members to a judgment litigated in their absence without denying them due process of law. *Clark v. South Central Bell Tel. Co.,* 419 F.Supp. 697, 701 (W.D.La.1976); *cf. Hansberry v. Lee,* 311 U.S.. 32, 61 S.Ct. 115, 85 L.Ed.2d 22 (1940). The requirement of typical claims, while somewhat ill defined, seems intended to reinforce the adequacy requirement by ensuring that the named plaintiffs' interests are sufficiently aligned with those of class members to assure that they not only can but will press each such claim to a full and equal extent.

The case of plaintiff Steven Smith raises additional very specific questions concerning membership in the class. Since that issue involves concerns relevant to both areas described above, as well as questions of standing and jurisdiction arising outside the Rule 23 context, it will be treated separately.

**2. *Membership in the Class Sought to Be Represented*** [4]

■■■ Many courts have stated that a named plaintiff must be a member of the class he seeks to represent. *E. g., East Texas Motor Freight v. Rodriguez, supra,* 431 U.S. at 403–404, 97 S.Ct. 1891 (1977); *Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Senter v.*

---

**4.** The obvious threshold but rarely discussed requirement is that there be an identifiable class, *i. e.,* a current, definite, recognizable and actual class of plaintiffs, as to whom the judg-

ment is *res judicata.* In the present case this requirement presents no difficulties or problems and warrants no analysis or discussion.

General Motors Corp., supra, 532 F.2d at 518; Harriss v. Pan American World Airways, Inc., supra, 74 F.R.D. at 39–40; C. Wright & A. Miller, Federal Practice and Procedure § 1761 (1972). This deceptively simple rule cloaks a number of thorny questions that remain to be settled by the courts. Indeed, courts have differed substantially as to the source of the rule, and the analysis may change depending on whether class membership is viewed as a question of standing, e. g., Senter v. General Motors Corp., supra, 532 F.2d at 518; as a question of jurisdiction under Article III of the United States Constitution, e. g., Satterwhite v. City of Greenville, Tex., 557 F.2d 414 (5 Cir. 1977) (rehearing en banc granted); as an independent requirement of Rule 23(a), e. g., Harriss v. Pan American World Airways, Inc., supra, 74 F.R.D at 39–40; or as an aspect of adequate representation pursuant to Rule 23(a)(4), e. g., Wright v. Stone Container Corp., 524 F.2d 1058, 1062–1063 & n. 5 (8 Cir. 1975).

▮ In this case, however, the only dispute on this point involves plaintiff Steven Smith, as to whom its application is relatively straightforward. Interpreting Rule 23(a), the Supreme Court has recently held that named plaintiffs who had been found at trial on the merits to have "suffered no injury as a result of the alleged discriminatory practices * * * were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury." East Texas Motor Freight v. Rodriguez, supra, 431 U.S. at 403–404, 97 S.Ct. at 1897. The same principle would appear to apply where, as here, the material facts are not in dispute and the finding of non-discrimination was accordingly made on motion for summary judgment.

Since summary judgment presents none of the procedural problems of an informal "mini-hearing" under Rule 23, this result does not violate the rule of Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177–178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), barring preliminary inquiry into the merits of a claim in order to determine whether a class action may be maintained. Lorber v. Beebe, 407

F.Supp. 279, 291 n. 11 (S.D.N.Y.1975); Haas v. Pittsburgh National Bank, 381 F.Supp. 801, 803–806 (W.D.Pa.1974), modified on other grounds, 526 F.2d 1083 (3 Cir. 1975), see Roberts v. American Airlines, Inc., 526 F.2d 757, 762–763 (7 Cir. 1975); cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976); Miller v. Mackey International, Inc., 452 F.2d 424, 428–429 (5 Cir. 1971). The Courts of Appeal have gone considerably beyond this narrow interpretation of Eisen IV, however, in permitting class representation by named plaintiffs whose claims have been determined by recognized judicial procedures to be without merit, provided they otherwise meet the requirements of Rule 23. E. g., Horn v. Associated Wholesale Grocers, Inc., 555 F.2d 270, 276–277 (10 Cir. 1977); Donaldson v. Pillsbury Co., 554 F.2d 825, 831 n. 5 (8 Cir.), cert. denied, 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977); Gibson v. Local 40, Supercargoes & Checkers, etc., supra, 543 F.2d at 1263; Smith v. Delta Air Lines, Inc., supra, 486 F.2d at 514–515; cf. Huff v. N. D. Cass Company of Alabama, 485 F.2d 710 (5 Cir. 1973) (en banc).

▮ In so holding, the courts have failed adequately to analyze the effect of lack of class membership under Rule 23. Where the question has been explicitly addressed, two different approaches have been taken. Some courts have recognized that the lack of an individual claim precludes class membership, but have viewed class membership as only one aspect of adequate representation, the lack of which is not, as a matter of law, in itself sufficient to bar a finding of adequacy. E. g., Wright v. Stone Container Corp., supra, 524 F.2d at 1062–1063; Satterwhite v. City of Greenville, Tex., supra, 557 F.2d at 423. Others appear to regard class membership as a separate and essential prerequisite to class representation, perhaps derived from the first clause of Rule 23(a) ("[o]ne or more members of a class may sue * * * "), but hold that the absence of an individual claim does not preclude membership. Long v. Sapp, 502 F.2d 34, 42 (5 Cir. 1974). Neither approach can survive East Texas Motor Freight v. Rodriguez, supra,

431 U.S. 395, 97 S.Ct. 1891. To be sure, the Supreme Court did rely on other factors tending to show that the named plaintiffs there could not adequately represent the class. 431 U.S. at 404–405, 97 S.Ct. 1891. And the Supreme Court recognized that a ruling against the named plaintiff need not bar the entry of a judgment or an injunction in favor of a class where the class has been properly certified and its claims tried on the merits. 431 U.S. at 406 n. 12, 97 S.Ct. 1891. The effect of summary judgment against the named plaintiff in a case where a class has been properly certified but not yet brought to trial was not discussed, and remains uncertain. *Zablocki v. Redhail*, 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (Rehnquist, J., dissenting). But a fair reading of *Rodriguez* leads inevitably to the conclusion that where the record developed at or before the time of class certification requires the entry of judgment against a named plaintiff, that named plaintiff is not a member of any putative class and is therefore per se unable to serve as class representative. To the extent prior law holds to the contrary, this Court believes it has been overruled.

▮▮▮ Logic as well as authority dictate this result. To permit a plaintiff to assert the claims of a class of which he is not a part and to seek relief in which he has no concrete individual interest is to sanction a sham class action and to abandon any substantial role for the named plaintiff himself, as distinguished from his attorney. *See Wright v. Stone Container Corp., supra*, 524 F.2d at 1062; *Huff v. N. D. Cass Company of Alabama*, 468 F.2d 172, 179 (5 Cir. 1972), reversed on rehearing *en banc*, 485 F.2d 710 (1973); *Satterwhite v. City of Greenville, Tex., supra*, 557 F.2d at 426 (Gee, J., dissenting). As the Court of Appeals for this Circuit has stated in another context, Rule 23 was not designed to authorize "massive class actions conducted by attorneys engaged by near-nominal plaintiffs." *La Mar v. H & B Novelty & Loan Company, supra*, 489 F.2d at 465. Indeed, the *La Mar* court explicitly cautioned trial courts to avoid assuming an administrative role in the management of class actions, as

suggested by the Court of Appeals for the Fifth Circuit. 489 F.2d at 463–464; *Compare Satterwhite v. City of Greenville, Tex., supra*, 557 F.2d at 419. Finally, it is appropriate to note how little is given up by insisting on a named plaintiff who has a concrete interest in the suit. If defendant is actually engaged in illegal conduct of the sort challenged by plaintiff Smith, there must necessarily be claimants who can properly bring suit against them. *See Johnson v. Railway Express Agency*, 421 U.S. 454, 467 n. 13, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975); *Hernandez v. Gray*, 530 F.2d 858, 859 (10 Cir. 1976).

▮▮▮ In light of the foregoing, this Court cannot accept the conclusion of the majority in *Satterwhite v. City of Greenville, Tex., supra*, that a named plaintiff whose individual claim has been rejected prior to class certification can ever be an adequate class representative in an employment discrimination case. 557 F.2d at 423. Since the claims of the other plaintiffs in this case provide the case or controversy necessary to this Court's jurisdiction, it is unnecessary to address the question with which that opinion was principally concerned. To the extent it deals with the Rule 23 issue, however, this Court must respectfully disagree. Accordingly, plaintiff Steven Smith will not be permitted to represent any class.

3. *The Appropriateness of Class Treatment: Rule 23(a)(1), (a)(2), and (b)(2)*

▮▮▮ Although the structure of Rule 23 has generally led courts to analyze the propriety of a class action by looking first to the prerequisites listed in Rule 23(a) and then to the applicable subdivision of Rule 23(b), it has long been recognized that a showing of action taken against a class on grounds generally applicable thereto (here discrimination) will provide the common questions necessary to satisfy Rule 23(a)(2). *See* C. Wright & A. Miller, Federal Practice and Procedure § 1763 at 609–610 (1972). The only distinct issues raised by Rule 23(b)(2) are the appropriateness of equitable relief and the impact of monetary relief. It

is not disputed here that the alleged scheme of discrimination would, if proved, make equitable relief appropriate, and it is well settled that a prayer for monetary relief does not make (b)(2) treatment inappropriate. *Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 46; *Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 251 (3 Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). In view of the substantial overlap of the two requirements in these circumstances, they will be treated together here.

### a. *Legal Principles*

■ Neither requirement has ever been precisely defined. Commonality has often been treated together with typicality or indeed simply passed over without analysis. The meaning of "typicality" has been a subject of considerable debate. It clearly does overlap to some extent with commonality, and the Court does not purport to define the outer limits of either. The plain language of the rule suggests, however, that the heart of the (b)(2) and (a)(2) requirements is a finding that the grievances raised by the named plaintiffs are more than factually unrelated, individualized personal claims. This issue has been treated under a variety of theories: as a question of typicality, read to require the plaintiff to establish the existence of a class, *e. g., Wright v. Stone Container Corp., supra,* 524 F.2d at 1062; *Taylor v. Safeway Stores, Incorporated,* 524 F.2d 263, 270 (10 Cir. 1975); *White v. Gates Rubber Company,* 53 F.R.D. 412, 415 (D.Colo.1971); of numerosity, *e. g., O'Brien v. Shimp,* 356 F.Supp. 1259, 1266 (N.D.Ill.1973); *Page v. Curtiss-Wright Corporation,* 332 F.Supp. 1060, 1071 (D.N.J.1971); or of some combination of the two designated the "quantitative aspect of the typicality requirement," *Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831. All the labels refer to the same problem, which this Court views as one of commonality: the named plaintiffs' claims must charge discrimination based on patterns and practices not special or unique to themselves, and the members of the putative class must have been similarly victimized by the same

patterns or practices. *Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831. Safeway contends that no such patterns or practices are at issue in this case.

■ Safeway's position on this issue is disingenuous. It characterizes the plaintiffs' claims as merely personal grievances but argues that the principle of *Eisen v. Carlisle & Jacquelin, supra,* 417 U.S. at 177–178, 94 S.Ct. 2140, prevents plaintiffs from relying on statistics at this stage to demonstrate the existence of a pattern of discrimination common to all their claims. It is true, as defendant points out, that plaintiffs have not challenged any specific articulated policy which operates to the detriment of a definable class of employees, such as testing, seniority, or transfer rules; height, weight, or strength restrictions; or pregnancy policies. The legality of such practices, where they exist, obviously provides a question of law common to those adversely affected by them, and, if found illegal, a ground for injunctive relief. *E. g., Patterson v. General Motors Corp.,* 10 F.E.P.Cases 921, 922 (N.D.Ill.1974). The only such policies mentioned by plaintiffs here are Safeway's reliance on women's protective laws until 1971 in conjunction with the job assignment of food clerks, and the use of subjective standards for promotion. But the first has been raised by Safeway as a defense to plaintiffs' claims of discrimination, and accordingly does not become relevant until discrimination is proved. And the law is clear that the second is not in itself an illegal employment practice. Subjective standards become relevant only when they have been shown to have the effect of excluding minorities or women from promotion. *E. g., Chavez v. Tempe U. High School Dist. No. 213,* 565 F.2d 1087, 1094–1095 (9 Cir. 1977); *Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211, 240–241 (5 Cir. 1974). Thus, commonality is not so easily found in this case.

■ Subtler forms of discrimination, not embodied in any identifiable rule, are not immune from challenge by a class. Thus, a pattern of discrimination may be

proved by an unexplained statistical disparity in the numbers of minorities or women hired, promoted, trained, transferred, disciplined, or terminated, at least where the statistics are supported by evidence of individual instances of discrimination. *Teamsters v. United States*, 431 U.S. 324, 337–339, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Even though individual claims raise differing issues of fact, that pattern serves to shift the burden of proof in the second phase of a bifurcated class action proceeding. *Id.* at 359, 97 S.Ct. 1843; *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 772–773, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). The questions common to this type of class are whether the evidence shows a pattern of discrimination, and whether that pattern is attributable to the operation of some employment practice applicable generally to the class.

 In this type of case, the named plaintiffs' claims will always have the initial appearance of individualized grievances. But that does not preclude the maintenance of a class action. For example, numerous courts have rejected the argument that the importance of individual factors in decisionmaking with respect to upper management promotion or professional hiring negates the existence of common questions or bars the ultimate issuance of an injunction. *E. g., Senter v. General Motors Corp., supra*, 532 F.2d at 423–424; *Lamphere v. Brown University*, 71 F.R.D. 641, 646–648 (D.R.I.1976), *app. dismissed*, 553 F.2d 714 (1 Cir. 1977); *Martinez v. Bechtel Corp.*, 10 E.P.D. ¶ 10,507, at 6354 (N.D.Cal.1975); *Kohn v. Royall, Koegel & Wells*, 59 F.R.D. 515, 521 (S.D.N.Y.1973), *app. dismissed*, 496 F.2d 1094 (2 Cir. 1974). If broad-based discrimination is in fact proved at trial on the merits, the individual considerations will be handled in the subsequent phase of the proceedings. *See Senter v. General Motors Corp., supra*, 532 F.2d at 524. Nor does the decentralization of actual decisionmaking necessarily preclude class treatment, for it is clear that an overall policy of discrimination may be implemented through local decisions. *E. g., Ste. Marie v. Eastern R. R. Ass'n*, 72 F.R.D. 443, 447–

449 (S.D.N.Y.1976); *Fujita v. Sumitomo Bank of Cal.*, 70 F.R.D. 406, 410 (N.D.Cal. 1975); *Martinez v. Bechtel Corp., supra*, 10 E.P.D. at 6354; *Rosario v. New York Times Co.*, 10 E.P.D. ¶ 10,450, at 5947 (S.D.N.Y. 1975).

This type of case does, however, raise two difficult issues. First, how much proof of a generalized pattern of discrimination is required of plaintiffs at the stage of the class determination? Second, once some showing has been made, what are the boundaries of the class as to which it can fairly be said there is reason to believe the defendant has acted on generally applicable grounds and there are common questions of fact or law?

 Courts have on occasion suggested that the mere assertion of an individual claim together with omnibus allegations of discrimination are sufficient to satisfy the requirements of Rule 23(a)(2) and (b)(2). *E. g., Senter v. General Motors Corp., supra*, 532 F.2d at 524; *Lamphere v. Brown University, supra*, 71 F.R.D. at 646. The dangers of such an approach are readily apparent. If the mere allegation of pervasive discrimination were sufficient to satisfy the common question requirement in this type of case, courts would transform every individual grievance into a potential class action. Because of the enormous increase in back pay exposures as well as the expense of class-based discovery, this would vastly increase the bargaining power of disgruntled minority and female employees in the course of settlement negotiations. *See Arey v. Providence Hospital*, 55 F.R.D. 62, 68 (D.D.C.1972). It is perhaps because of this emasculation of the commonality requirement that some courts have required plaintiffs to show the existence of other individuals with claims of discrimination as a matter of typicality or numerosity. *See* p. 478, *supra; White v. Gates Rubber Company, supra*, 53 F.R.D. at 415. The Court of Appeals for the Ninth Circuit appears to be taking a more straightforward approach, recognizing that although the allegations of a plaintiff's complaint are ordinarily to be taken as true for purposes of a

class determination, the plaintiff bears the burden of providing sufficient factual information for the Court to form a reasonable judgment on the issues raised by Rule 23. *Blackie v. Barrack*, 524 F.2d 891, 901 & n. 17 (9 Cir. 1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). *See also Equal Employment Op. Com'n v. Detroit Edison Co.*, 515 F.2d 301, 311 (6 Cir. 1975), vacated on other grounds, 431 U.S. 951, 97 S.Ct. 2669, 53 L.Ed.2d 267 (1977). Thus, a general assertion of discrimination in the complaint is simply insufficient to satisfy the common question requirement, at least where, as here, the record establishes a degree of decentralization in administration of employment practices. *Doninger v. Pacific Northwest Bell, Inc., supra*, 564 F.2d at 1311.

█ In this case, then, plaintiffs must make some showing that a pattern of discrimination generally affecting the members of the proposed class in fact exists. *Ibid.; see also Peterson v. Albert M. Bender Co.*, 75 F.R.D. 661, 665–666 (N.D.Cal.1977); *Martin v. Easton Pub. Co.*, 73 F.R.D. 678, 683 (E.D.Pa.1977); *Lo Re v. Chase Manhattan Corp.*, 431 F.Supp. 189, 197 (S.D.N.Y. 1977); *Lim v. Citizens Sav. and Loan Ass'n*, 430 F.Supp. 802, 807–809 (N.D.Cal.1976); *O'Connell v. Teachers College*, 63 F.R.D. 638, 639–640 (S.D.N.Y.1974); *Patterson v. General Motors, supra*, 10 F.E.P.Cases at 922.

There is some conflict between this result and the teaching of *Eisen v. Carlisle & Jacquelin, supra*, 417 U.S. at 177–178, 94 S.Ct. 2140. Plaintiffs are not to be permitted or required to prove their case at this time, and to determine whether they have established a prima facie case of discrimination would pose the precise dangers mentioned by the Supreme Court in that case. That high a threshold is plainly impermissible. *Contra, Lim v. Citizens Sav. and Loan Ass'n, supra*, 430 F.Supp. at 808. However, this Court cannot find that the *Eisen IV* court, concerned as it was with adequate procedural safeguards for a Title VII defendant, would have approved the maintenance of a class in this type of case in the absence of significant factual inquiry. Accordingly, the Court concludes that Rules 23(a)(2) and (b)(2) require plaintiffs to make a factual showing of class-based discrimination sufficient to provide substantial questions for resolution at trial.

█ It is clear that a showing of disparate treatment in one geographical area, facility, or personnel practice does not always imply that discrimination pervades a defendant's business. *Cf. Doninger v. Pacific Northwest Bell, Inc.*, 564 F.2d at 1311. A court should closely examine the contours of the proposed class to ensure that it is limited to that group commonly affected by the pattern of discrimination shown. *Taylor v. Safeway Stores, Incorporated, supra*, 524 F.2d at 270; *Harriss v. Pan American World Airways, Inc., supra*, 74 F.R.D. at 41. This determination requires the court to ascertain the boundaries within which plaintiffs' showing actually raises common questions. Such factors as geographic dispersion, diversity of employment conditions, work activities, or individual class members' characteristics, diffusion of claims over time, and decentralized or disuniform administration of personnel policies, may require that the class be narrowed to that group within which some uniformity and cohesiveness obtains. *Harriss v. Pan American World Airways, Inc., supra*, 74 F.R.D. at 41; *see, e. g., Doninger v. Pacific Northwest Bell, Inc., supra*, 564 F.2d at 1309–1311; *Gibson v. Local 40, Supercargoes & Checkers, etc., supra*, 543 F.2d at 1264–1265; *Jones v. United Gas Improvement Corp.*, 68 F.R.D. 1, 17–19 (E.D.Pa.1975). This is not to say that a single individual claim may not trigger a full-scale, across-the-board attack on a defendant's employment practices. It is to say, however, that plaintiffs who seek to challenge a broad array of practices, not specifically defined and spread over a large, diverse, farflung, locally autonomous business operation, bear a substantial burden of establishing the common element which makes it appropriate to treat them all in a single action brought by a small group of individuals.

b. *Application*

These principles may be considered in the context of each of the three separate subclasses proposed by plaintiffs.

i. *San Francisco Retail Division*

Five named plaintiffs seek to represent a subclass within the San Francisco Retail Division. Irma Wofford and Deborah Ison are white women who claim to have suffered from discrimination in the job assignments necessary to learn store operations in anticipation of promotion (Ison) and from discrimination in promotion itself (Wofford). They have identified 24 other women with claims of sex discrimination, 19 of which involve opportunities for advancement. Plaintiff Curt Robinson is a Black male who claims to have been denied a promotion from courtesy clerk to food clerk and further opportunities for training and promotion because of his race. Plaintiffs have listed ten other Black and Hispanic employees with claims involving opportunities for advancement. Finally, Mary Traylor and Olivia Tijero, a Black and a Hispanic woman respectively, allege discrimination in conditions of employment and in termination on the basis of their race and national origin. Plaintiffs list 9 other individuals, the majority of whom are Blacks, who allege similar claims.

In support of their class allegations, plaintiffs rely on their listing of other potential claimants and on a limited statistical analysis. With respect to the retail stores, they have submitted workforce breakdowns for the year 1974 (when the *Wofford* suit was filed) showing a substantial disparity between the number of women, Blacks, Hispanics, Asians, and total minorities in management positions and the number of employees in those categories in the food clerk population, and statistics for 1969–1973 showing similar disparities in Black, Hispanic, and Asian management employment. In addition, plaintiffs' figures show a disparity between the number of minority food clerks employed in the years 1969 to 1974 (13.7–16.8%) and the minority population within the geographic area of the division (26% as of the 1970 census).

These statistics are far from sufficient to establish a prima facie case. There are serious questions about the relevant pools of applicants for hire and for promotion; the availability of qualified and interested applicants for promotion; the relevant time periods for comparison purposes; and the weight to be given to the rates of promotion and hiring. But these are precisely the sorts of questions, common to the putative class, that are appropriately reserved for trial. The figures submitted, together with the individual claims listed by plaintiffs, are sufficiently suggestive to satisfy the plaintiffs' burden with respect to a divisionwide pattern of refusal to hire or to retain in employment minority employees in entry level positions, and segregation of both women and minorities in lower level positions.

None of the named plaintiffs' claims is so unique as to place him outside this suggested pattern. Defendant has emphasized the geographical dispersion of employees in the division and the autonomy within each district and store with respect to post-hire personnel management. Where decisionmaking is really decentralized, there can of course be no common questions outside the organizational units within which the relevant decisions as to the named plaintiffs were made. *E. g., Parker v. Kroger Co.,* 14 F.E.P.Cases 75, 80 (N.D.Ga. 1976); *Jones v. United Gas Improvement Corp., supra,* 68 F.R.D. at 18–19. But defendants admit that the hiring and initial training of clerks is entirely centralized. And both parties' statements of fact reveal that virtually all employment policies, including affirmative action goals and timetables, RMTP training procedures, criteria for promotion, and the sequence of promotion, are set and monitored at the division level; that inter-district transfers are possible; and that the 6-month seniority penalty depends on union, not district boundaries. Certainly, decisions in individual cases are made by immediate superiors. Plaintiffs are not, however, challenging one individual's exercise of the discretion given him by

Safeway's employment structure. They are challenging the structure itself, and they have submitted evidence which raises the question whether there is a uniform application of discriminatory policies throughout. There is no suggestion that the districts or stores in which named plaintiffs worked are unique or depart from the general pattern in any way. In these circumstances, the class need not be subdivided at the level of actual decisionmakers. *See* p. 479, *supra.*

 The facts do suggest, however, that district managers, retail operations managers, and the division manager are subject to a different set of policies. They are employed outside the actual retail stores, and plaintiffs have submitted no statistics governing them. To progress above the store manager level, employees must apparently participate in national management development training. The pool for promotions extends outside the division, and the selection of individuals for promotion may involve consultation with officials above the division level. In light of these problems, the Court cannot find that these managers have been affected by the alleged discrimination in the same way as the named plaintiffs. *Cf. Fujita v. Sumitomo Bank of Cal., supra,* 70 F.R.D. at 410 (bank tellers and clerks cannot represent officers); *Henderson v. First National Bank of Montgomery,* 360 F.Supp. 531, 534–535 (M.D.Ala.1973). Even if some degree of commonality could be found, the named plaintiffs' claims are not typical of the claims of these employees in that these differences clearly "affect the nature of an effective presentation of their claims * * *." *Gibson v. Local 40, Supercargoes & Checkers, etc., supra,* 543 F.2d at 1264. Accordingly, the subclass may not include retail store management employees above the level of store manager.

In addition to the retail store employees, plaintiffs seek to include in this subclass all employees at the division's Fremont office. The figures submitted by plaintiffs for January 1975 show only 2.9% women and 4.4% minorities in management positions at that office, although plaintiffs have made no attempt to categorize the types of manage-

ment jobs available or the relevant pools for any of them. Many appear to be specialized positions such as security officer or affirmative action director. Among clerical workers, minorities constituted 19.5% as compared to 27.4% clerical availability in Alameda County. Plaintiffs suggest that that disparity is limited to Blacks and Hispanics.

No named plaintiff has ever worked at this office or sought to do so, and the questions raised there appear entirely distinct from those raised at the retail stores. Plaintiffs' principal argument for commonality is that many managerial jobs are filled from within. But with the exception of the few management employees directly responsible for supervision of retail operations, the departments at Fremont provide specialized, support services. This is not the usual pyramidal chain of promotion to greater and greater authority. Promotions are rather lateral moves requiring some specialized ability or qualification. Claims in this area would thus require inquiry into entirely different pools of applicants, and perhaps different recruiting, selection, and training procedures. Except for the bare statement that well over half the officials and managers came from outside the division, none of these details are before the Court. The Court can only conclude that these jobs fall outside the relatively simple, standardized progression of hiring, training, and promotion which provides the subject matter of this subclass's claims.

Similarly, the clerical jobs pose their own problems different from those raised by food or courtesy clerks. The appropriate pool for comparison, training, promotion and discipline of clerical employees would all involve differing questions of fact and law. Even the hiring procedure is less centralized, since actual selection is made in the appropriate department.

 Differing job classifications do not always require limitations on a class. *E. g., Women's Committee, etc. v. National Broadcasting,* 71 F.R.D. 666, 669 (S.D.N.Y. 1976). But none of the people employed at Fremont are subject to the common prac-

tices affecting the named plaintiffs. Although there may have been discrimination practiced there, it is simply not appropriate to burden this subclass with the complexities of this varied and differently administered office. *See Burwell v. Eastern Airlines, Inc.*, 68 F.R.D. 495, 498 (E.D.Va.1974); *see generally Piva v. Xerox Corp.*, 70 F.R.D. 378, 388 (N.D.Cal.1975); *Kinsey v. Legg, Mason & Company, Inc.*, 60 F.R.D. 91, 99 (D.D.C.1973), *reversed on other grounds*, 557 F.2d 830 (D.C.Cir.1977); *Calhoun v. Riverside Research Institute*, 4 E.P.D. ¶ 7825, at 6123 (S.D.N.Y.1972).

Even as to retail store employees, there must be some further limitations on the proposed subclass. First, it is evident from plaintiffs' analysis that Asians occupy a unique position within the division. Though underrepresented in store and assistant manager positions, they are by plaintiffs' own standard substantially overrepresented in produce manager positions. They have suffered no discrimination in clerical positions in the Fremont office, and plaintiffs do not describe their representation in entry level positions in retail stores. Plaintiffs attempt to minimize this striking difference by characterizing the treatment of Asians as "stereotyping" and suggesting that the Court simply leave out of account the figures for Asian produce managers. But whether Asians have been treated evenhandedly and gravitated to produce as a matter of preference or whether they have been systematically segregated into that department, it is clear that defendant has not acted toward them on the same grounds generally applicable to other minorities. And resolution of the differing theories as to the source of their treatment would be a major focus of any inquiry into discrimination against them, not common to the rest of the class.

If there were an Asian named plaintiff, the Court would consider the possibility of a subclass of Asians. But there is no Asian among the named plaintiffs, and the difference in treatment which negates commonality also creates a serious conflict of interest between any other plaintiff and the subclass of Asians, thus precluding any possibility that he or she could adequately represent the class. *See infra.* Accordingly, Asian employees and applicants cannot be included in this subclass.

Second, the only showing in the record of discrimination against women other than in opportunities for advancement consists of a list of four women who allegedly have hiring claims, one who claims discrimination in maternity benefits, and two who claim discriminatory termination. There has been no suggestion of a generally discriminatory policy regarding maternity or any other benefits, and there is no indication of underrepresentation of women in entry level positions or of a pattern of discriminatory terminations. The named plaintiffs' claims are limited to discrimination in opportunities for advancement, and the pattern suggested by the statistics is the classic one of hiring women and treating them on an equal basis as long as they stay "in their place." The Court finds the questions raised by such claims to be entirely distinct from those raised by an overall policy of discrimination as evidenced by refusal to hire and a pattern of harassment, arbitrary discipline, unjustified termination, and denial of benefits. Accordingly, the subclass of women must be limited to those past, present and future employees who have sought or have been deterred from seeking advancement by reason of defendant's policies. Defendant has suggested that only 17.6% of all female food clerks have any desire to enter management. Even assuming this to be the case, such a class would contain over 300 individuals among present employees alone—clearly enough to satisfy any criterion of numerosity.

In contrast, two minority plaintiffs, as well as 19 other named minority individuals, have claims suggesting a general policy of discrimination, and the statistics suggest that defendant may have been refusing to hire, firing, or otherwise deterring minorities from retaining employment even in entry level positions. Although the Court has some doubt that claims of harassment or discriminatory discipline will be susceptible of proof on a class basis, it is possible that

plaintiffs will be able to prove a series of incidents suggesting an overall pattern of discriminatory treatment. Defendant's hiring practices are administered somewhat differently than are the practices challenged in the plaintiffs' individual claims. But the difference lies only in greater centralization. Since no policies extending outside the division are involved, and since hiring claims are easily encompassed within the general pattern suggested by plaintiffs' proof, the Court finds they may be included for purposes of Rule 23(a)(2) and (b)(2). Accordingly, the minority subclass may include all retail store employees (excluding meat department employees) and rejected applicants, other than Asians. Although exact figures are not before the Court, this would appear to include roughly 1000 present employees, again far too numerous for joinder even if rejected applicants and past and future employees are left out of consideration.

### ii. *Corporate Headquarters*

Four plaintiffs seek to represent the corporate headquarters subclass. As discussed in Part II, B, 2, *supra*, Steven Smith is not eligible to represent any class. The other three plaintiffs are Black women. Charlene Iadevaia, a computer programmer, alleges harassment and discrimination in job assignment, work review and benefits. Mary Milton asserts that she was denied the opportunity to work in the supervisory position in Safeway's word processing center for which she was hired, and that she was subsequently discriminated against in training, promotion, transfer, benefits, and work assignments. Myrtis Davis, a former secretary who seeks to represent a subclass at the supply divisions as well as the corporate headquarters, claims that she was retaliated against, while employed at the legal department of the corporate headquarters, for filing an EEOC complaint concerning her treatment at the Produce Division.

To support their allegations of disparate treatment against a class, plaintiffs rely on statistics showing a low percentage of minorities employed in each of the three broad categories of employees (managers, professionals, and clerical), and a low percentage of women in managerial and professional positions. With the exception of clerical employees, however, plaintiffs have made little effort to demonstrate that these figures show discrimination by reference to relevant pools of qualified applicants. This is understandable in light of the high degree of specialization in the various departments. It is virtually certain that each position would require analysis of a different pool of candidates. For example, it would appear absurd to speak of a pool of "professional women" who might be available for hire when the professional positions in question range from attorney to engineer to computer programmer.

In addition, with but two single exceptions, there is no evidence of any centralized administration of employment practices regarding management and professional employees. Those exceptions are the initial recruiting and screening of new employees for referral to and final selection by the departments, and the formulation and administration of the affirmative action program. Notwithstanding the small size of some of the departments and the organization into 6 general functional areas, the conclusion is inescapable that, at least insofar as presently employed managers and professionals are concerned, the departments are operated as autonomous functional units. Among management and professional personnel, transfer between those units is rare. There has been no suggestion of discrimination in the administration of the affirmative action program itself, and the specialized nature of the various jobs simply destroys any common questions that might otherwise arise out of the employee relation department's screening and pre-selection of candidates for jobs. *See* generally cases cited pp. 482–483, *supra*. It is no answer to suggest that the categories could be lumped together, as plaintiffs have done, into all managerial and all professional employees. It is obvious that minorities and women may not be equally represented or available in all departments, and a showing of disparity in such overall categories is

merely an invitation to go beneath those figures to find where the actual problems have occurred and whether they can be defended.

In short, this Court cannot believe it would be desirable as a matter of judicial administration to combine so many entirely separate and distinct claims, involving such separate proofs, in a single subclass represented by one or two plaintiffs and their attorneys. They could certainly be tried in a single, complex action, but there would have to be separate subclasses, each with its own advocate, concentrating and developing expertise in the particular data, defenses, and interests relevant to each group. Without this safeguard, the Court has serious doubts that employees and potential employees in each department would .be adequately represented. It may be true, as plaintiffs suggest, that this permits some unstated policy of discrimination to escape rectification by this Court. But in light of the possibility of adverse results in overly ambitious classes, this is not contrary to the policy of Title VII.

Thus, Charlene Iadevaia's claim raises questions common only to employees in the data processing center. As to that department in particular, there is no showing of any pattern of discrimination either as to women or Blacks, nor any showing of the number of members in any putative subclass. However, the Court cannot agree with defendant's characterization of her claim as a merely personal disagreement with a supervisor. If she can make an adequate showing that there is a pattern of discrimination within her department and that the class is so numerous that joinder is impracticable, a subclass could be appropriate.

Mary Milton sought and obtained what was at least nominally a management position in the word processing center. That department, however, appears to consist exclusively of clerical employees and their supervisors. Personnel practices regarding clerical employees are far less decentralized than are those just discussed. Job openings are posted throughout the headquarters and transfers between departments are not infrequent. Promotions are administered by the employee relations department, and are not limited to any particular department. Even defendant suggests that Milton could represent all typists and that Davis could represent all secretaries.

The statistics for clerical personnel show minorities at 16.7%, as compared with total minority availability of 27.4% in Alameda County. Even assuming that to be the appropriate geographic area, there are no statistics showing underrepresentation of women. And there is not even any indication of what promotions clerical employees may obtain, much less any showing that women have been excluded from those jobs. Although plaintiffs have given a general listing of 6 other corporate headquarters employees with discrimination claims, they have not specifically identified any other clerical employees with similar claims. There has been no showing, beyond Milton's bare assertion, that women are discriminated against in promotion to supervisory positions among clerical employees. Where a plaintiff has not brought forth any other evidence of a discriminatory pattern, the failure to name other employees with similar claims can be fatal to her attempt to represent a class. *E. g., Wright v. Stone Container Corp., supra,* 524 F.2d at 1062–1063; *O'Connell v. Teachers College, supra,* 63 F.R.D. at 639–640. Here, unless plaintiffs produce some further evidence of discrimination against women clerical employees, it is sheer speculation to suppose that there may be a class of women who can claim discrimination.

With respect to minorities, plaintiffs' showing again falls short of a prima facie case, but the Court finds it adequate, together with the claims of Milton and Davis, to raise questions of a pattern of discrimination against minorities generally. Since there were 70 minority clerical employees at the corporate headquarters in 1974, numerosity presents no problem. Accordingly, a subclass consisting of minority clerical and supervisory clerical employees may be maintained.

### iii. *Supply Divisions*

The only named plaintiffs raising claims against these offices are Humberto Luna-Salabarria, a Hispanic male who worked as an accounting clerk at Safeway Brands and at Brookside and who alleges discriminatory job classification and pay scales, and Myrtis Davis, who worked as a secretary at Produce and, after her stay in the legal department at corporate headquarters, at Brookside. She complains of discriminatory job classification at Produce and discrimination in working conditions at Brookside, allegedly in retaliation for her filing an EEOC complaint as to the first incident.

The parties have provided strikingly little information as to the employment practices at these three offices. In the absence of further data, the Court is not persuaded that the situation regarding professional and managerial employees is any different than that which obtains in the corporate headquarters. Accordingly, the only possible subclass for employees in those categories would comprise the accounting departments at either Brookside or Safeway Brands (or perhaps both if a showing of some unified employment practices could be made). There is no showing whatsoever of any pattern of discrimination in that department and thus no subclass can be tentatively certified at this time.

With respect to clerical employees, there has again been no showing suggesting a pattern of discrimination against women. Plaintiffs acknowledge that minorities are well represented in office and clerical jobs at Brookside. They have presented no statistics for Brands Buying, and there is in any case no suggestion in the record that any clerical employee has a claim against that division. In the Produce Division, minorities may be underrepresented, but as of March, 1975, the class of minority clerical employees would have consisted of only 3 individuals. Even including rejected applicants and past employees in the class, the Court has substantial doubt that the numerosity requirement would be satisfied. Without some further showing specifically addressed to that issue, the Court cannot find that plaintiffs' burden of establishing numerosity has been satisfied.

Accordingly, no subclass at the supply division headquarters can be certified at this time.

### 4. *The Individual Plaintiffs*

 The final two requirements of Rule 23 shift the focus of the Court's inquiry to the individual plaintiffs. The overriding concern is whether it will be fair and constitutional to bind the members of the putative class to a decree fashioned in their absence by these plaintiffs. Although the requirements of Rule 23(a)(3) and (4) overlap substantially, analysis of each has generally concentrated on certain separate, definable issues, and they will accordingly be treated separately.

#### a. *Fair and Adequate Protection of the Interests of the Class: Rule 23(a)(4)*

 The requirement of adequate representation has two elements. First, the named plaintiffs' counsel must be qualified, experienced, and generally able to conduct the litigation. *E. g., Fendler v. Westgate-California Corporation*, 527 F.2d 1168 (9 Cir. 1975). Courts may take into account any prior failure to proceed in the best interests of the putative class in this litigation, as well as counsel's general qualifications. In this case, the Court perceives no problems on this score. Defendant urges that plaintiff Wofford's delay in moving for class determination has been so substantial as to disqualify her, an argument which the Court views as going principally to the diligence of counsel, rather than the zeal or fiduciary capabilities of the named plaintiff herself. No class determination was sought in *Wofford* until October, 1976, 32 months after suit was filed. However, a fairly steady course of discovery proceeded during that time, and all parties have always recognized that the suit was brought on a class basis. *See Senter v. General Motors Corp., supra*, 532 F.2d at 521–522. The delay was at least in part attributable to settlement negotiations, and the Court does not find 4 periods of dormancy totalling some 20

months to be excessive in the circumstances. Finally, consolidation with the *Traylor* and *Milton* plaintiffs, whose attorneys have shown skill and diligence in the prosecution of these actions, bodes well for the future.

Wofford's situation is plainly distinguishable from both of the cases relied on by defendant. In *East Texas Motor Freight v. Rodriguez, supra,* no class determination was sought until after trial on the merits. 431 U.S. at 405, 97 S.Ct. 1891. And in *Lau v. Standard Oil Co. of California,* 70 F.R.D. 526 (N.D.Cal.1975), plaintiff's sole actions in over 2 years were some minimal discovery, a specious motion for summary judgment, and a cross-motion in response to defendant's motion to deny class status. The Court recognizes that defendant is prejudiced to some extent by any delay. But the case is a complex one requiring considerable discovery to establish that a class is appropriate. The Court cannot find that there has been such a failure to prosecute as would indicate an inability to represent fairly and adequately the putative class.

■ The second element of adequate representation focuses on the named plaintiffs themselves. It is clear that there must be no evidence of collusion or of conflicting interests between the named plaintiffs and members of the class. *E. g., Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 42. Beyond this, a named plaintiff must display some minimal level of interest in the action, familiarity with the practices challenged, and ability to assist in decisionmaking as to the conduct of the litigation. *In re Goldchip Funding Company,* 61 F.R.D. 592, 594–595 (M.D.Pa.1974); *see Marshall v. Target Stores, Inc.,* 11 F.E. P.Cases 775 (E.D.Mo.1975); *Hyatt v. United Aircraft Corp.,* 50 F.R.D. 242, 245 (D.Conn. 1970). Employment discrimination cases do not rest on such sophisticated legal or economic theories as to preclude understanding by named plaintiffs. *Compare Chevalier v. Baird Sav. Ass'n,* 72 F.R.D. 140, 146–147 (E.D.Pa.1976) (antitrust action). Nor are

they cases in which injury to any possible representative is so small that the role of the named plaintiff is merely formal. *See La Mar v. H & B Novelty & Loan Company, supra,* 489 F.2d at 465–466. There would appear to be no other reason to accede to the notion that a class action "belongs to no one so much as to the plaintiff's lawyer," *Satterwhite v. City of Greenville, Tex., supra,* 557 F.2d at 426 (Gee, J., dissenting), and the potential for conflict of interest which that position entails. In these cases, a Court can and should insist on a named plaintiff who takes some active interest and has some ability to contribute to the action.

■ Defendant seeks to disqualify two of the named plaintiffs as inadequate to represent any class on these grounds. Plaintiff Humberto Luna-Salabarria is now living in Florida. Defendant argues that this geographic separation precludes him from taking any real part in the action and thus from adequately representing the class. No such per se rule was established by the case cited in support of this contention, *Marshall v. Target Stores, Inc., supra,* 11 F.E.P.Cases 775, and any such rule would be unwise. It is entirely possible that an enthusiastic plaintiff residing at some distance from other class members and from the forum could, by letter, telephone, or personal visit participate in the conduct of the litigation to an equal or greater extent than a local plaintiff. But a distant residence is a handicap which causes the Court some concern. If plaintiffs elect to seek certification of a subclass of employees in the accounting departments at Safeway's supply divisions, they should submit more information as to Mr. Luna-Salabarria's ability to represent that class.

■ Finally, plaintiff Irma Wofford has been in various managerial positions since August, 1974, and is now a store manager. As defendant acknowledges, this change in circumstances does not moot her claim of discriminatory denial of promotion.[5] It

---

5. Mootness prior to class certification may bar a court from entertaining a class. *E.g., Vun Cannon v. Breed,* 565 F.2d 1096 (9 Cir. 1977); *Kuahulu v. Employers Ins. of Wausau,* 557 F.2d 1334 (9 Cir. 1977). But Wofford's claims are still very much alive as to back pay. *E.g., Jenkins v. United Gas Corporation,* 400 F.2d 28, 34 (5 Cir. 1968).

does create a potential conflict of interest. However, class action treatment need not be denied unless there is a substantial conflict going to the subject matter of the action. *Marshall v. Holiday Magic, Inc.,* 550 F.2d 1173, 1177 (9 Cir. 1977). The only conflict alleged here is between Wofford's interest in promoting equal advancement opportunity for women at Safeway and her obligation to Safeway, as a manager, to adhere to its personnel policies, including the treatment of all employees evenhandedly without regard to sex. But that is no real conflict. Wofford seeks only equal opportunity for women, according to the law. There is no evidence that her involvement in the suit has caused or will cause her to favor women in the administration of her store. Nor is there any reason to believe that her obligations as a manager will interfere with vigorous prosecution of the class claims. She will not be harmed in any way by the promotion of more women into management. Since she holds a non-union position, even seniority relief would have no adverse effect on her status with the company.

Only one case cited by defendant holds to the contrary, *Rodgers v. United States Steel Corporation,* 69 F.R.D. 382, 389 (W.D. Pa.1975). There, the court failed to analyze the question of conflict of interest in terms of the issues raised in the lawsuit. The result is thus not in accord with the law in this Circuit, and this Court will not follow it. The other cases cited deal with the different situation of a plaintiff who was a management employee before suit was filed and whose claims were not limited to denial of promotion. *Wells v. Ramsay, Scarlett & Co., supra,* 506 F.2d 436; *McClinton v. Turbine Support, Div. of Chromalloy Am. Corp.,* 68 F.R.D. 236, 238 (W.D.Tex.1975). These cases turn not on any purported conflict of interest, but on the differing work situations and interests of management and union employees with respect to claims other than promotion—factors which impair both commonality and typicality. Those concerns do not arise where, as here, the named plaintiff's claim was admittedly typical at the time it arose, and the problem derives from a subsequent promotion. In similar circumstances, at least one court has found the interests of employees who seek to advance into management to be coextensive with those of a management plaintiff. *Lo Re v. Chase Manhattan Corp., supra,* 431 F.Supp. at 197–198.

Some of the concerns that have led courts to reject mootness arguments in this situation also support this conclusion. The alternative would jeopardize the enforcement of Title VII as to discriminatory systems of promotion, since noncomplying employers could simply promote any minority employee bold enough to file suit. *See Jenkins v. United Gas Corporation, supra,* 400 F.2d at 33. That result cannot be justified by any of the requirements of Rule 23. The Court finds Ms. Wofford's interests to be squarely aligned with those of the subclass she seeks to represent, and accordingly finds that she has satisfied the requirements of Rule 23(a)(3), *infra,* as well as 23(a)(4), on this point.

b. *Typicality of Claims or Defenses: Rule 23(a)(3)*

 Although there has been considerable debate as to the meaning of typicality, it now appears that Rule 23(a)(3) must be given independent meaning, and that the analysis must focus on a comparison of the representative plaintiffs' claims and defenses with those of the class. *Taylor v. Safeway Stores, Incorporated, supra,* 524 F.2d at 270. Factual variations are not fatal to a proposed class when the claims arise out of the same remedial and legal theory. *E. g., Donaldson v. Pillsbury Co., supra,* 554 F.2d at 831. Such variations do, however, raise two issues of typicality.

 First, they may require consideration of legal issues other than those common to the class. At least one court has held that the common issues must occupy "essentially the same degree of centrality" to the named plaintiffs' claim as to that of

other class members. *Cottrell v. Virginia Electric & Power Company*, 62 F.R.D. 516, 520 (E.D.Va.1974). Thus, Rule 23(a)(3) may preclude class treatment when the legal and factual positions of the representatives are "markedly different" from those of other members. C. Wright & A. Miller, Federal Practice and Procedure § 1764 (Supp.1977). And if it is predictable that "a major focus of the litigation will be on an arguable defense unique to the named plaintiff or a small subclass, then the named plaintiff is not a proper class representative." *Koos v. First National Bank of Peoria*, 496 F.2d 1162, 1164 (7 Cir. 1974).

 In its final attack on Ms. Wofford as a class representative, defendant argues that her loss in an arbitral proceeding raises issues so important to her claim that she must be precluded from representing the class on this line of authority. That loss does not, of course, bar her claim. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). A federal court must consider the claim *de novo, id.* at 60, 94 S.Ct. 1011, and although the arbitral decision is admissible in evidence, the weight to be accorded it depends on a variety of factors. *Id.* at 60 n. 21, 94 S.Ct. 1011. Review of those factors and appropriate weighting of the arbitral decision is of course an issue unique to Wofford's claim. But the Court regards it as a collateral one, similar to evidentiary disputes that may arise in the proof of any particular claim. Thus, Ms. Wofford cannot be barred from representing a class on this ground.

 Factual variations may also reveal that different groups of class members have differing interests which, though not actually in conflict, will "affect the nature of an effective presentation of their claims * * *." *Gibson v. Local 40, Supercargoes & Checkers, etc., supra*, 543 F.2d at 1264. Courts have said that the named plaintiffs' claim must be "squarely aligned in interest" with the putative class, *Harriss v. Pan American World Airways, Inc., supra*, 74 F.R.D. at 42; and that plaintiffs' interests must be coextensive with those of the class on all issues that relate to the class, *Senter v. General Motors Corp., supra*, 532 F.2d at 525. It now seems clear that the mere anticipation that all class members will benefit from the suit, *Ellis v. Naval Air Rework Facility, Alameda, Cal.*, 404 F.Supp. 391, 396 (N.D.Cal.1975), is not enough. But interests sufficiently parallel to ensure a vigorous and full presentation of all potential claims for relief should satisfy Rule 23(a)(3). *Donaldson v. Pillsbury Co., supra*, 554 F.2d at 831. In making this determination, a court must look to each plaintiff's employment situation, the circumstances surrounding his grievance, and the relief he seeks.

In this case, defendant has alleged generally that plaintiffs' claims are merely personal grievances. That allegation is directed partially to the issue of commonality and as such has already been discussed. If the facts of an individual claim were so unique as to shift the focus of inquiry into that claim, or to suggest a different pattern of interests, such allegations would of course generate typicality problems. But no such major differences have been shown.

 Defendant's challenge to plaintiff Wofford's typicality involves her promotion to store management. The Court finds this argument unpersuasive. *See* pp. 487–488, *supra*. With respect to plaintiff Ison, defendant argues that she was a part-time employee who now intends to pursue a career in mathematical ecology. Yet Ison alleges that part-time male employees were given the varied assignments necessary as a prerequisite to advancement, and that she repeatedly asserted an interest in advancement while working at Safeway. Her interest in another career has no impact on these claims. Although she may now have less stake in changes in promotional opportunities at Safeway, there is ample support for the position that former employees may represent present employees, this difference notwithstanding. *E. g., Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 247; *Reed v. Arlington Hotel Co., Inc., supra*, 476 F.2d at 723; *Bachman v. Collier*, 73 F.R.D. 300, 305–306

(D.D.C. 1976); *Fujita v. Sumitomo Bank of Cal., supra,* 70 F.R.D. at 411.[6]

Plaintiff Robinson's claim arises at the lowest levels of the promotion chain: from courtesy to food clerk. Yet his allegations—that despite repeated requests for promotion, he was bypassed in favor of less qualified whites with less seniority—are absolutely typical of discriminatory promotion claims generally. He also expressed an interest in management training, and his interests would appear to be squarely aligned with those of other retail store employees who may have sought promotion to a higher level.

With respect to the other plaintiffs, defendant has not even suggested any major differences in interest. Each has alleged various specific acts adversely affecting her which may or may not have been a part of the alleged pattern of discrimination. *See* pp. 481–482, 490, *supra.* Whether or not they were is a question for trial.[7]

On a more general plane, defendant has raised several factual differences, none of which requires a narrowing of the subclasses within which common questions have been found.

i. *Minority Group*

■ Defendant argues that each plaintiff's claim is typical only of the claims of individuals belonging to the same minority group. In the absence of some difference in position among members of different groups, courts have consistently rejected this contention. *E. g., Ellis v. Naval Air Rework Facility, Alameda, Cal., supra,* 404 F.Supp. at 396–397; *Jones v. Milwaukee County,* 68 F.R.D. 638, 641 (E.D.Wis.1971); *N. O. W. v. Bank of California,* 5 E.P.D. ¶ 8510, at 7442–7443 (N.D.Cal.1972). *But see Martin v. Safeway Trails, Inc.,* 59 F.R.D. 683, 684 (D.D.C.1973). With the exception of Asians in the retail stores, there has been no suggestion that defendant prefers or in any way varies its treatment of one minority group as compared to the others. Since no different interests have been shown, the Black and Hispanic plaintiffs may represent Blacks, Hispanics, Native Americans and, in the corporate headquarters, Asians.

■ There is, however, an inherent conflict where minority women claiming race and sex discrimination seek to represent both minorities and women. *Martinez v. Bechtel Corp., supra,* 10 E.P.D. at 6355; *Bell v. Automobile Club of Michigan,* 18 F.R.Serv.2d 1496 (E.D.Mich.1974). Since the claims are that defendant prefers whites (even women) over minorities, and men (even minorities) over women, a minor-

6. These holdings rest on the adverse consequences of a contrary rule on the enforcement of Title VII. A rule disqualifying discharged employees from representing current employees as a matter of law would be intolerable, since it would allow an unscrupulous employer to immunize himself from class action suits. The fact that the employee does not seek reinstatement should not change this result. However, the policy is not as clear where, as here, an employee resigns voluntarily and has no desire to return. Some courts have refused to permit class representation in these circumstances. *Ashworth v. Sherwin-Williams Co.,* 10 F.E.P.Cases 709, 710 (N.D.Ga.1974); *Jenkins v. General Motors Corporation,* 354 F.Supp. 1040, 1044 (D.Del.1973). But Ison, as well as the other named plaintiffs in this action who resigned their employment with Safeway, claim that they did so because they were discouraged by the alleged discrimination and harassment. The extent of their dissatisfaction and their freedom from fear of retaliation makes these former employees among the most likely plaintiffs in Title VII actions. To bar them from representing current employees unless they stay on the job would either impose a hardship on individuals who feel that those jobs offer them no future, or prevent class treatment in a significant number of cases. The Court finds that in these circumstances the dangers to Title VII enforcement outweigh the dangers arising from the differing interests of former and current employees, particularly since the divergent interests are limited to one area, and a court should thus be able to monitor the conduct of the action to assure that adequate representation is being provided.

7. The failures of various individual plaintiffs to name other individuals with grievances similar to theirs, greatly emphasized by defendant, is simply not relevant to typicality in this sense. Listing of other potential claimants is a possible, though not a necessary, ingredient in a showing that some class exists. *See* pp. 479–480, 485–486, *supra.*

ity woman cannot simultaneously represent both minority men and white women. Though perhaps not rising to the level of a true conflict of interest in itself, the interests of minority and of women employees are sufficiently different to preclude a finding of typicality as to either where a single plaintiff seeks to represent both. Here, Olivia Tijero, Myrtis Davis, Mary Milton, and Charlene Iadevaia all claim discrimination based on race or national origin and sex. But the Court has already found that the only common questions with respect to women employees in the retail division subclass deal with opportunities for advancement, a claim Tijero does not raise. The Court does not find the sex discrimination theory to be so central to her claim as to prevent her from representing the subclass for all minorities.

Similarly, Charlene Iadevaia may represent either minorities or women in a subclass for data processing employees at the corporate headquarters, should such a subclass be shown to be otherwise appropriate. Finally, there has been no showing of discrimination against women clerical employees in the corporate headquarters. Davis and Milton may thus represent minorities only.

### ii. *Collective Bargaining Unit*

■ Defendant's argument that each plaintiff's claim is typical only of employees in his own collective bargaining unit is frivolous in the absence of a showing that unit lines have some impact on the practices alleged or that employees in different units have otherwise differing interests with respect to some issue in the action. *Sagers v. Yellow Freight System, Inc.*, 58 F.R.D. 54, 57–58 (N.D.Ga.1972), *affirmed as modified*, 529 F.2d 721 (5 Cir. 1976); *see Ste. Marie v. Eastern R. R. Ass'n, supra*, 72 F.R.D. at 449; *cf. Parker v. Kroger Co., supra*, 14 F.E.P.Cases at 81–82 (class limited where disparate and divergent agreements restricted to some extent the employer's personnel practices). No such showing has been made here.

### iii. *Type of Claim and Job Classification*

■ Defendant's argument that each named plaintiff's claim can be typical only of a small subclass of employees with virtually identical claims is, with one exception, similarly unpersuasive. Within the subclasses defined in Part II, B, 3, b, supra, pp. 481–486, the Court perceives no significant difference in interest among those groups of employees who have suffered from arbitrary and discriminatory discipline, termination or harassment on the job, whatever the particular circumstances; or among those employees denied opportunity for advancement, at whatever level that denial occurred.

■ The only substantial question arises from the potentially different interests of the minority named plaintiffs, all past employees, and the rejected applicants for employment they seek to represent. Courts have come to widely varying conclusions on this question. *Compare Long v. Sapp, supra*, 502 F.2d 43; and *Piva v. Xerox Corp., supra*, 70 F.R.D. 378, 387–388 (N.D.Cal. 1976); *with Equal Employment Op. Com'n v. Detroit Edison Co., supra*, 515 F.2d at 311 (persons who were employed not adequate representatives of applicants); *Chambers v. Franchise Realty Corp.*, 12 F.E.P.Cases 1817, 1820 (N.D.Ohio 1976) (current employee's claims not typical of applicants; nor is he adequate representative); *Barrett v. United States Civil Service Commission*, 69 F.R.D. 544, 554 (D.D.C.1975) (plaintiffs who were not refused employment not members of class of applicants); *Richmond Black Police Off. Ass'n v. City of Richmond*, 386 F.Supp. 151, 157 (E.D.Va.1974) (narrow interests of past applicants and past employees not adequately represented by current employees); *Rosario v. New York Times Co., supra*, 10 E.P.D. at 5947–5948 (class as to hiring inappropriate where no plaintiff with non-time-barred hiring claim).

Although the Court has found sufficient commonality of questions between hiring and other employment discrimination claims in this case, the across-the-board approach does not supply the identity of interests required by Rules 23(a)(3) and (4). On

the other hand, defendant has not specifically indicated how the rejected applicants' interests differ from those of the named plaintiffs here. Indeed, in the corporate headquarters subclass, Mary Milton does claim discrimination with respect to her initial hire, since she alleges that she was not hired for the position for which she was qualified. *See Rosario v. New York Times Co., supra,* 10 E.P.D. at 5947. As to the retail division subclass, the Court finds the interests of past employees and of applicants to be parallel. *Richmond Black Police Off. Ass'n v. City of Richmond, supra,* 386 F.Supp. at 157. As distinguished from current employees, they may be limited to back pay as a remedy. They may also, however, still be seeking employment with the defendant and thus be interested in prospective injunctive relief. The real conflict would appear to arise between these two groups, on the one hand, and current employees on the other, because of the possibility of seniority relief for past employees and rejected applicants, which would not be in the interests of current employees. There are no current employees among the named plaintiffs for either of the subclasses which include applicants. The Court finds, however, that enforcement of Title VII could too easily be thwarted if former employees were precluded from representing current employees on the basis of this conflict, and many courts have so held. *See* pp. 489–490 & n. 6, supra. In the absence of some specific differing interests, the Court is aware of no reason why they may not represent applicants as well.

5. *Time Limits*

■ The timely filing of an EEOC charge is ordinarily a jurisdictional prerequisite to suit under Title VII. The law is clear, however, that only the named plaintiffs need meet this requirement on behalf of a class, and that the named plaintiffs' filing tolls the statute of limitations on behalf of the class. *E. g., Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d at 246. Thus, a class member is not required to have filed an EEOC charge on his own behalf in order to benefit from a class ac-

tion. But he will be limited to those claims as to which he could have filed a charge on or after the date of the earliest charge filed by a named plaintiff representing the class. *Ibid.; Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 40–41; *Martinez v. Bechtel Corp., supra,* 11 F.E.P.Cases at 905–906.

■ There may be some difficulties in applying this rule where continuing violations are alleged, as to which the statute of limitations does not apply. *E. g., Wetzel v. Liberty Mutual Insurance Co., supra,* 508 F.2d at 246. In states where Title VII requires deferral to state agencies, there may be some question whether the applicable time period is 300 or 180 days. Finally, the Title VII limitation is not applicable to claims asserted by minority class members pursuant to 42 U.S.C. § 1981, and the choice of a statute of limitations applicable to § 1981 is problematic. Since none of these questions have been briefed, and since at this stage the precise time limitations will have little significant effect on the proceedings, the Court will not attempt to define any subclass with precision on this point. It may be noted, however, that at best, plaintiffs may represent a class for Title VII purposes only as to those individuals who were employed or who unsuccessfully sought employment with Safeway on or after a date 300 days prior to the earliest filed EEOC charge applicable to their subclass, *see Harriss v. Pan American World Airways, Inc., supra,* 74 F.R.D. at 41 n. 12; and for § 1981 purposes only as to minority individuals with claims arising after December 9, 1970, four years before the *Traylor* lawsuit was filed, *see Griffin v. Pacific Maritime Association,* 478 F.2d 1118, 1119 (9 Cir. 1973); *Groves v. Insurance Co. of North America,* 433 F.Supp. 877, 884–885 (E.D.Pa.1977).

C. *Notice*

■ Defendant has urged that in view of the difficulty of making the determinations outlined above, the Court should order that notice be sent, at plaintiffs' ex-

pense, to members of the putative subclasses in order to determine whether their claims are in fact sufficiently similar to those of the named plaintiffs and sufficiently numerous to require class treatment. In actions within Rule 23(b)(2), the Court has discretion pursuant to Rule 23(d)(2) to order notice designed to elicit further information concerning compliance with Rule 23(a). This is permissible even when a plaintiff makes an initial showing of compliance, provided nonresponses are not used to exclude class members or to measure numerosity. *Bauman v. United States Dist. Court*, 557 F.2d 650, 659–660 (9 Cir. 1977). It is not, however, a requirement imposed by Rule 23. *Elliott v. Weinberger*, 564 F.2d 1219, 1228 (9 Cir. 1977). Nor is it a requirement of due process in the ordinary case. *Id.* at 1228–1229; *Larionoff v. United States*, 175 U.S.App.D.C. 32, 49–52, 533 F.2d 1167, 1184–1187 (1976), *affirmed*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 255–257. The imposition of notice as a matter of course would create significant additional costs which could tend to discourage class actions in contravention of the purposes of Title VII. *Wetzel v. Liberty Mutual Insurance Co., supra*, 508 F.2d at 254. · Notice should thus be required only when necessary to protect the interests of class members.

In this case, the difficult issues in deciding the class determination motion arise from the nature of defendant's employment structure and would not be illuminated by the submission of additional individual claims. The Court finds no significant danger of inadequate representation of the interests of the class, and the issues are not of the sort that call for the submitting of views as *amicus curiae*. If any of these circumstances should arise in the future, notice may be directed at that time. For the present, defendant's request will be denied.

## III. ORDER

IT IS HEREBY ORDERED that defendant's motion for summary judgment against plaintiff Steven Smith in *Traylor v. Safeway*, No. C–74–2575–CBR, is granted. Defendant's counsel are directed to prepare an appropriate form of judgment, obtain the approval of opposing counsel as to form, and submit it to the Court for execution within ten (10) days of the date of this order.

IT IS HEREBY FURTHER ORDERED that these consolidated actions may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following subclasses:

1. All women who are or have been employed or in the future will be employed, subject to time limits to be determined by the Court, in the San Francisco Retail Division of Safeway Stores, Inc., in any position in which employees are represented by a retail clerks local or as store manager, and who have sought or have been deterred by defendant's policies from seeking training or promotion. The representative plaintiffs for this subclass will be Irma Wofford and Deborah Ison.

2. All Blacks, Hispanics, and Native Americans who have applied for employment, have been or are employed, or may in the future be employed, subject to time limits to be determined by the Court, in the San Francisco Retail Division of Safeway Stores, Inc., in any position in which employees are represented by a retail clerks local or as store manager. The representative plaintiffs for this subclass will be Mary Traylor, Curt Robinson, and Olivia Tijero.

3. All Blacks, Hispanics, Native Americans, and Asians who have applied for employment, have been or are employed, or may in the future be employed, subject to time limits to be determined by the Court, in clerical positions or as supervisors of clerical employees, in the national administrative headquarters of Safeway Stores, Inc. The representative plaintiffs for this subclass will be Myrtis Davis and Mary Milton.