**Booker GIBSON et al.,
Plaintiffs-Appellants,**

v.

**LOCAL 40, SUPERCARGOES AND CHECKERS OF the INTERNATIONAL LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION, et al., Defendants-Appellees.**

**Nos. 73–3358 and 74–1923.**

United States Court of Appeals,
Ninth Circuit.

Sept. 29, 1976.

*County of Riverside*, 18 Cal.App.3d 372, 375–76, 95 Cal.Rptr. 879, 881 (1971).

Don Marmaduke (argued), Tonkon, Torp & Galen, Portland, Or., for plaintiffs-appellants.

Raymond J. Conboy and Marshall C. Cheney, Jr. (argued), Portland, Or., for defendants-appellees.

Before BROWNING and TRASK, Circuit Judges, and WILLIAMS,* District Judge.

BROWNING, Circuit Judge:

Appellants brought this class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., against Supercargoes and Checkers Local 40; its parent, International Longshoremen's and Warehousemen's Union (ILWU); and Pacific Maritime Association (PMA), an association of shipping, terminal, and stevedoring companies. Appellants charge that appellees discriminate against appellants and other black persons in the employment of "checkers" or clerks. The district court found for appellees. We reverse.

Clerks are employed to perform clerical functions related to receiving, delivering, checking, tallying and spotting cargo during the loading and unloading of ships. The basic work skills required are an ability to read, to write, to do simple mathematics, and to measure cargo with a tape measure.

ILWU and PMA negotiate coastwide rules governing the rights and responsibilities of clerks. Local 40 and PMA jointly support, operate, and control a Joint Port Labor Relations Committee which main-

---

* Honorable Spencer Williams, United States District Judge, Northern District of California, sitting by designation.

tains registration lists and operates a dispatch hall for clerks in the Portland maritime area.

Clerks are classified class A, class B, and casual clerks. Membership in Local 40 is restricted to class A clerks. Class A clerks are given first priority for available work. Class B clerks are given second priority.

Occasionally, industry needs cannot be filled by class A or class B clerks alone. Until February 1971 the deficiency was met by dispatching casual clerks. Thereafter, class A (and perhaps class B) longshoremen from Local 8 of ILWU were dispatched before casual clerks.

One of the four appellants, Booker Gibson, had applied for employment as a casual clerk in October 1967. Learning that white applicants had been dispatched for employment as casual clerks even though they had filed applications later than he, appellant Gibson filed a charge with EEOC alleging racial discrimination.[1] The day after Local 40 received the charge, appellant Gibson was dispatched for employment as a casual clerk. After February 20, 1968, however, appellant Gibson was no longer dispatched for employment.

Meanwhile, EEOC completed its investigation of appellant Gibson's complaint, and on June 11, 1968, issued a decision that reasonable cause existed to believe that appellees had violated Title VII. Conciliation efforts failed. On September 30, 1968, appellant Gibson was notified of his right to sue. This action was filed October 30, 1968. The district court dismissed the action on November 13, 1970, for failure to exhaust state remedies. We reversed and remanded for trial. *Gibson v. Local 40*, 465 F.2d 108 (9th Cir. 1972). After trial the district court entered judgment for appellees, holding that the suit was not an appropriate class action and that the evidence failed to disclose discrimination. This appeal followed.

I

The trial court stated that appellants "failed to show compliance with Rule 23(b)." The court offered no explanation for this conclusion.[2] Appellees argue that the ruling was correct because appellant failed to prove discrimination against either a class or any of the individual appellants. We conclude that appellants proved both. In any event, failure of proof as to the named plaintiffs would not bar maintenance of the class action or entry of judgment awarding relief to the members of the class.[3]

1. ILWU contends that it is not a proper party to this action because it was not named in the charge filed by appellant Gibson with EEOC, and 42 U.S.C. § 2000e–5(f)(1) confers jurisdiction only "against the respondent named in the charge." *See Le Beau v. Libbey-Owens-Ford Co.*, 484 F.2d 798, 799 (7th Cir. 1973). Appellant Gibson's complaint to EEOC identified the charged parties as "Super Cargo and Checkers Union" and "Pacific Maritime Commission." A copy of the charge was mailed to ILWU. Everyone concerned, including ILWU, treated ILWU as a fully participating party. ILWU did not raise the issue of whether it was named in the charge until the first day of the second trial. It is evident from the record that EEOC and the parties were apprised of both the acts alleged to be discriminatory and the parties allegedly responsible for them. The purpose of the statute was therefore satisfied. *See Kaplan v. Theatrical & Stage Employees*, 525 F.2d 1354, 1358–59 (9th Cir. 1975); Note, *Employment Discrimination and Title VII of the Civil Rights Act of 1964*, 84 Harv.L.Rev. 1109, 1203–04 (1971).

2. The trial court also referred to Fed.R.Civ.P. 23(c). It is clear from the complaint and pretrial order that appellants sought to maintain their class action only under Fed.R.Civ.P. 23(b)(2). Notice therefore was not required. Nor need appellants have requested a ruling on the class nature of the suit, for an examination of the record and rendition of a ruling are independent obligations of the court. *Rodriquez v. East Texas Motor Freight*, 505 F.2d 40, 49–50 (5th Cir. 1974).

The court's resolution of the class action issue is not entitled to the deference due such a determination when it is supported by findings as to the applicability of Rule 23 criteria. *Price v. Lucky Stores, Inc.*, 501 F.2d 1177, 1179 (9th Cir. 1974); *Clark v. Watchie*, 513 F.2d 994, 1000 (9th Cir. 1975).

3. *Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340 (10th Cir. 1975); *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 548 n.5 (4th Cir. 1975); *Roberts v. Union Co.*, 487 F.2d 387, 389 (6th Cir. 1973); *Huff v. N. D. Cass Co.*, 485 F.2d 710, 712 (5th Cir. 1973); *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1380

■ Since the trial has been completed and a full record is before us, it is appropriate that we determine whether the action is to be maintained as a class action.[4] We conclude that appellants have met the requirements of Federal Rule of Civil Procedure 23(a) and established a class action under Federal Rule of Civil Procedure 23(b)(2), but for a class narrower than claimed.

The class claimed is all black persons subjected by appellees to racial discrimination who are employed or may be employed, who may have attempted or may hereafter attempt to obtain employment, as clerks in the Portland maritime area, or who may now or hereafter seek membership in Local 40. We conclude that the class should be narrowed to those black persons who are or may be employed, or who may have attempted or may attempt to obtain employment, as casual clerks in the Portland maritime area.

Appellees do not contest the fact that the suggested class is so numerous that joinder is impossible. Fed.R.Civ.P. 23(a)(1). Appellees do not deny the existence of questions of law and fact common to the class. Fed.R.Civ.P. 23(a)(2). Appellees do not argue that appellants will not fairly and adequately protect the interests of the proposed class. Fed.R.Civ.P. 23(a)(4). The record reflects the competency of counsel and we are unable to conceive of any respect in which appellants' interests might conflict with those of any other members of the class limited as we propose.[5]

Appellees do dispute, however, that appellants' claims or defenses are typical of those of a class. Fed.R.Civ.P. 23(a)(3). Appellees also deny they have acted or refused to act on grounds generally applicable to the proposed class. Fed.R.Civ.P. 23(b)(2).

Both of these contentions rest upon appellees' assertion that each appellant was removed from the group referred for employment as casual clerks for independent reasons that had nothing to do with race.

■ Appellants' suit is based upon their common claim that appellees subjected appellants and other members of their class to employment practices that were racially discriminatory. Appellees' contention that each appellant was treated as he was for reasons peculiar to him and unrelated to race was only a defense to appellants' common claim, and, in our view, an unsuccessful one. A class action may be maintained under Federal Rule of Civil Procedure 23(b)(2), alleging a general course of racial discrimination by an employer or union, though the discrimination may have been manifested in a variety of practices affecting different members of the class in different ways and at different times.[6]

Nonetheless, we conclude that persons who are, would have been, or may attempt to be, class A and class B clerks should be excluded from the class on the record in this case. The record discloses differences between class A and class B clerks and casual clerks that affect the nature of an effective presentation of their claims with respect to both liability and relief.

Class A and class B clerks constitute the permanent work force. They are not permitted to hold other regular employment. Class A clerks are guaranteed a 36-hour weekly wage and class B clerks are guaranteed an 18-hour weekly wage. To accommodate these guarantees, class A clerks are limited to about 75 percent of anticipated work force requirements, and class B clerks to about 25 percent. Class B clerks serve as apprentices, and are promoted to class A status as vacancies occur. Casuals, on the

(4th Cir. 1972); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1124–25 (5th Cir. 1969).

4. *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 51 (5th Cir. 1974).

5. *See Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3d Cir. 1975).

6. *See Rich v. Martin Marietta Corp.*, 522 F.2d 333, 340–41 (10th Cir. 1975); *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 547–48 (4th Cir. 1975); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1124 (5th Cir. 1969); *Jenkins v. United Gas Corp.*, 400 F.2d 28, 33–34 (5th Cir. 1968).

other hand, are not part of the permanent work force. They may hold other regular employment. They have no guaranteed wage. There is no apprenticeship relationship between casuals and class A and class B clerks.

■ All of the appellants were casuals. All held other employment. None of them sought employment as class A or class B clerks or indicated any interest in doing so. The pretrial and trial record concentrated upon the referral and employment of casuals. It is noticeably less complete with respect to the referral and employment of class A and class B clerks.[7] If included in the class, class A and class B clerks might be barred by res judicata from obtaining relief to which they could be entitled on a fully developed record.[8]

We turn to the merits.

## II

The district court concluded "there was certainly no invidious plan or understanding among the several defendants to discriminate against the plaintiffs or their colleagues because of their race." This finding may not be clearly erroneous, but neither does it justify a judgment for appellees.

■ Appellants were not required to prove that appellees intentionally discriminated against appellants and their class. "The objective . . . of Title VII is . . . to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees. Under the Act, practices, procedures, or tests neutral on their face, and even neutral in terms of intent, cannot be maintained if they operate to 'freeze' the status quo of prior discriminatory employment practices." *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). "Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation." *Id.* at 432, 91 S.Ct. at 854, (emphasis in original). Accordingly, "[l]ack of discriminatory intent is not a defense" to a charge of violating Title VII. *Gates v. Georgia-Pacific Corp.*, 492 F.2d 292, 295 (9th Cir. 1974).[9]

The evidence established a prima facie case of discrimination by appellees against blacks in the referral and employment of casual clerks in the Portland maritime area in violation of Title VII. Appellees failed to rebut this prima facie case.

7. For example, appellants did not press at trial, nor do they press on appeal, the possibly discriminatory six-year "freeze" of blacks in class B. Appellants did not present evidence at trial, nor do they argue on appeal, that the income differential between class A and class B was discriminatory. Appellants did not seek to rebut appellees' evidence that special abilities and experience were necessary to act as a supercargo or supervisor. Appellants did not argue that qualified blacks were, or could have been, available for these positions at an earlier date. Appellants request that the preference system be abolished and that former A's, B's, and casuals be treated equally in dispatch, relief that would appear to be adverse to the economic interests of the six black class A clerks. Appellants fail to discuss sections 703(h) and (j) of Title VII, 42 U.S.C. §§ 2000e–2(h) & (j), provisions important to whether aspects of appellees' seniority system with respect to classes A and B constitute wrongs remediable under Title VII.

8. There is "a duty upon the court to consider carefully the requirement of fair and adequate

protection in view of the serious consequences of res judicata in class actions." *EEOC v. Detroit Edison Co.*, 515 F.2d 301, 311 (6th Cir. 1975). *See also Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122, 1125–27 (5th Cir. 1969) (Godbold, J., concurring); *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 547 n.4 (4th Cir. 1975).

9. *See EEOC v. Detroit Edison Co.*, 515 F.2d 301, 313–14 (6th Cir. 1975); *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 658–59 (2d Cir. 1971).

The Supreme Court's recent decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), is not to the contrary. The Court held that the equal protection component of the Due Process Clause of the Fifth Amendment is not violated by an official act solely because the act has a racially disproportionate impact, without regard to whether it has a discriminatory purpose. But the Court explicitly recognized that a different standard applies under Title VII. 426 U.S. at 239, 96 S.Ct. 2040.

■ It is undisputed that no blacks were employed as casual clerks in the Portland maritime area prior to October 1967. It is also undisputed that blacks constituted 2 percent of the population in the Portland metropolitan area, and that black males between the ages of 18 and 64 constituted 5.2 percent of the population of the city itself.

These facts were sufficient to establish a prima facie case of racial discrimination in violation of Title VII prior to October 1967, and to shift the burden to appellees to show a nondiscriminatory reason for the disparity. *United States v. Ironworkers Local 86*, 443 F.2d 544, 551 (9th Cir. 1971).[10] Moreover, James Byrne, Local 40's business agent, admitted the existence of racial discrimination prior to October 1967.

Appellees respond that ILWU and PMA "made vigorous and successful efforts to achieve racial balance in the Portland area in the ranks both of longshoremen and checkers" within a reasonable time after Title VII became effective.[11]

The Act was passed on July 2, 1964. The provisions of Title VII were not to be effective for one year. Section 716(a) of Civil Rights Act of 1964, 78 Stat. 266. This transition period was designed "to enable employers . . . and labor organizations to bring their policies and procedures into line with the requirements of the title, and to avoid a multitude of claims arising while such adjustments are made . . ." 110 Cong.Rec. 7243 (1964) (remarks of Senator Case).[12] Yet no blacks were added to the ranks of casual clerks until the fall of 1967, over two years after expiration of the period provided by the statute for the elimination of discriminatory practices. The steps taken by appellees at this late date perpetuated rather than terminated racial discrimination in the employment of casual clerks.

■ Five blacks were added to the group referred for casual employment in October and November of 1967. The additions were not the result of a recruitment effort by appellees. It is uncontradicted that the first black, appellant Gibson, was accepted for referral as a casual clerk only after he filed a complaint with EEOC.[13] The four other blacks were added to the group referred for casual employment shortly thereafter. It is uncontradicted that appellees ceased referring all five of the black casuals for work on the same day—February 20, 1967. Four were eventually removed from the list of casual clerks; one was reinstated.[14] Appellees at-

---

10. *See Watkins v. Scott Paper Co.*, 530 F.2d 1159, 1192 (5th Cir. 1976); *Barnett v. W. T. Grant Co.*, 518 F.2d 543, 549 (4th Cir. 1975); *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 259 (3d Cir. 1975); *Rodriguez v. East Texas Motor Freight*, 505 F.2d 40, 53–54 (5th Cir. 1974); *United States v. N. L. Industries, Inc.*, 479 F.2d 354, 368, 370 (8th Cir. 1973); *United States v. Chesapeake & Ohio Ry.*, 471 F.2d 582, 586 (4th Cir. 1972); *Brown v. Gaston County Dyeing Mach. Co.*, 457 F.2d 1377, 1382 (4th Cir. 1972).

11. The district court found: "Immediately prior and subsequent to the adoption of the Civil Rights Act of 1964 . . . Local 40 . . . sought to attract additional black persons to the work force . . . ." The activity to which the court refers was an effort by Local 8 to recruit black longshoremen in 1964. It had nothing to do with recruitment of black clerks. Local 40 was not involved.

12. *See* Note, *Title VII, Seniority, Discrimination, and the Incumbent Negro*, 80 Harv.L.Rev. 1260, 1266 (1967).

. . .

13. Two other blacks testified that appellees refused them applications in 1965 and 1966.

Only appellant Gibson filed a charge of discrimination with the Oregon Civil Rights Division and the Equal Employment Opportunities Commission. This does not preclude representation of the class by the other named plaintiffs or relief for the class. *See Franks v. Bowman Transp. Co.*, 424 U.S. 747, 771, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444 (1976); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414 n.8, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

14. Appellants Tanner and Smith did not appeal their removal to the Joint Port Labor Relations Committee, as they had a right to do under the collective bargaining agreement. An employee's Title VII rights are independent of contractual rights. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49–50, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). Exhaustion of the latter is therefore not a precondition to a Title VII suit. *Rios v. Reynolds Metals Co.*, 467 F.2d 54, 57 (5th Cir. 1972) (dicta); *Hardison v. Trans World*

tempted to show that there was a different, nonracial reason for each of these removals. The effort failed. The evidence of alternate grounds for dismissal was unconvincing; no explanation at all was offered for the fact that all of the blacks, and only they, were removed on the same day, a circumstance that can hardly be reconciled with nondiscriminatory motivation.[15]

After these removals, only the one reinstated black remained in the group referred for casual work employment, and he was later dropped again. The parties agree that no applications for casual employment were given out after the middle of November 1967. Except for an occasional, temporary, referral of an individual or two, no additions to the referral group for casual employment were made from the fall of 1967 until 1973.[16] There is no evidence that any black casuals remained in the referral group at the end of this "freeze."

This six-year "freeze" on new applications for casual clerks referral perpetuated the condition of almost total exclusion of blacks from the group of casual clerks that had come into existence because of appellees' prior discriminatory practices. This "freeze," in conjunction with the practice of referring only persons in this group for employment as casuals, discriminated in favor of the disproportionately white referral group and against blacks seeking employment as casual clerks. It therefore violated Title VII.[17]

---

*Airlines*, 375 F.Supp. 877, 880 (W.D.Mo.1974), *modified* 527 F.2d 33 (8th Cir. 1975); Note, *supra* note 1, 84 Harv.L.Rev. at 1222–23.

**15.** Appellees offered evidence that appellant Jelks was injured while engaged in other employment. But the accident occurred on February 21, 1968, the day *after* the five blacks were terminated; and appellant Jelks continued working for several weeks after the accident. Appellees offered proof that appellant Smith, appellant Tanner, and Beno Johnson failed to pay their pro rata share of hiring hall expenses and were suspended for that reason. But the three men testified that they were not told they were required to make such payments, a fact apparently conceded by Local 40 since Beno Johnson applied for and obtained reinstatement on this ground. Moreover, the three men were not informed of the alleged reason for their suspension, and their right to appeal, until August—six months after the five blacks had been simultaneously dropped. Appellees offered evidence that appellant Gibson failed to respond to telephone calls and refused to accept proffered work, and contended that his dispatch privileges were terminated for this reason. However, the earnings of casual checkers were so low (averaging about $1,750 during the two years in question) that casuals necessarily relied upon other employment, and particular individuals were commonly unavailable on given days. A PMA labor relations assistant testified that dispatchers would call a hundred men to fill four jobs. There was no showing that appellant Gibson failed to respond more frequently than the average white casual, nor any explanation for terminating his status as a casual on the same day as the other blacks. Moreover, it is undisputed that under the contracts between the union and PMA, casual card dispatch privileges could be revoked only by formal action of the Joint Port Labor Relations Committee.

Appellees offered an exhibit including individual records of 200 white casuals allegedly dropped because they were not available for work when called. The exhibit is of no assistance to appellees' case without some explanation and analysis. Appellees offered none. The exhibit appears to include individual records of all casuals withdrawn from the referral group over a period of four to five years. None of the 200 white casuals to which those records relate appears to have been terminated on February 20, 1968.

**16.** In 1969 appellees developed a test for casual clerks. It was administered to six specially recruited blacks. All apparently failed. An industrial psychologist testified that the test discriminated against blacks. Appellees offered no evidence to the contrary. They made no effort to show that the test was job-related. Tests that disqualify blacks at a substantially higher rate than whites and that are not shown by professionally acceptable methods to be significantly related to job performance (and this test was not) violate Title VII when (as here) the jobs involved have theretofore been given to whites only. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). *Cf. Washington v. Davis*, 426 U.S. 229, 246, 96 S.Ct. 2040, 2051, 48 L.Ed.2d 597 (1976) (dicta). *See* note 9 *supra*.

Appellees did not require Local 8's class A and class B longshoremen to take the test as a condition to referral for employment as casual clerks.

**17.** For the reasons stated in footnote 15 and related text, we are left with the definite and

■ Appellants also contend that preference was given to casuals who were related to class A clerks. Appellees' dispatcher testified that such a preference occurred at times and appellees admit as much in their brief.[18] The district court must have concluded that this nepotism was not discriminatory because there was no evidence that it was undertaken with a purpose to discriminate. The court's conclusion therefore rested upon a mistake of law. Since the relatives being preferred were disproportionately white, the nepotism discriminated against blacks whether or not appellees acted with a discriminatory purpose.[19]

■ At times casuals were referred for available work in the order of seniority. Since blacks were prevented from obtaining seniority by appellees' discriminatory hiring practices, this preference among casuals based on seniority also perpetuated the effects of past discriminatory practices and constituted a present violation of Title VII.[20]

■ Appellants contend that restriction of class A clerks to 70 to 75 percent and class B clerks to 30 to 25 percent of the anticipated work force is racially discriminatory. These restrictions are arguably discriminatory against black casuals if blacks were underrepresented in the two preferred classes. From the time of appellants' employment as casuals to the time of trial, six blacks—3.2 percent of the preferred

classes—were either class A or class B clerks. Appellants offered evidence that 5.23 percent of the population of the City of Portland were black males aged 18 to 64. Appellees countered with evidence that blacks constituted only 2 percent of the population of the metropolitan Portland area. Thus, the validity of an inference of discrimination rests upon whether the central city or the metropolitan area is the more relevant labor market for class A and class B clerks. The district court found that the metropolitan area was the appropriate demographic base. The district court's finding is not clearly erroneous in light of the evidence that 30 percent of class A and class B clerks reside outside the city itself. Absent an adequate showing that the group of class A and class B clerks was disproportionately white, the preference accorded that group in allotting available work was not shown to be racially discriminatory.[21]

After early 1971, members of Local 8, a longshoremen's union, were given preference for available clerical work over casual clerks. Appellants' contention that this practice is racially discriminatory rests on the premise that Local 8 was disproportionately white. Appellants' statistical proof again depended upon a showing that the city itself rather than the metropolitan area was the relevant labor market and in this respect appellants' showing was insufficient.

firm conviction that the district court was mistaken in its conclusion that "the evidence fails to disclose that there was any discrimination against the named plaintiffs, individually, because of their race."

18. Appellees state, "[n]otations on dispatch cards of casual clerks of relationship to persons working full time on the waterfront merely indicate that in event of need such persons may be more readily available and more easily contacted for dispatch." Brief at 52.

19. Local 53, *Heat & Frost Insulators v. Vogler,* 407 F.2d 1047, 1054 (5th Cir. 1969); *United States v. Iron Workers Local 1,* 438 F.2d 679, 683 (7th Cir. 1971); *cf. Barnett v. W. T. Grant Co.,* 518 F.2d 543, 549 (4th Cir. 1975); *United States v. N. L. Industries, Inc.,* 479 F.2d 354, 368 (8th Cir. 1973).

20. *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Evans v. United Air Lines, Inc.,* 534 F.2d 1247 (7th Cir. 1976); *Acha v. Beame,* 531 F.2d 648, 655 (2d Cir. 1976); *United States v. Navajo Freight Lines,* 525 F.2d 1318, 1325 (9th Cir. 1975); *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 224 (5th Cir. 1974); *United States v. Jacksonville Terminal Co.,* 451 F.2d 418, 450 (5th Cir. 1971).

21. Since appellants and their class are not harmed by alleged discrimination within class A and class B, and between these two classes, we do not consider the validity of these practices.

In view of our disposition of this appeal, appellants' appeal from denial of their motion for new trial is moot.[22]

Appellants will be allowed their costs and a reasonable attorneys' fee on this appeal, which we fix at $3,500. 42 U.S.C. § 2000e–5(k). *See Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131, 1133 (9th Cir. 1974); cf. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

Affirmed in part, reversed in part, and remanded for further proceedings.

**22.** Appellants' motion for new trial was based upon an affidavit of one of the dispatchers to the effect that to avoid dispatching blacks he and his fellow dispatcher made no calls to the black casuals after the black casuals had been dispatched a few times. Instead, he swore that he and his colleague had falsified entries on the cards of the black casuals to indicate that calls had been made but that there had been no response.