244 F.3d 1152 (9th Cir. 2001)
 LOCAL JOINT EXECUTIVE BOARD OF CULINARY/BARTENDER TRUST FUND; BARTENDERS UNION, LOCAL 165; CULINARY WORKERS UNION, LOCAL 226; HARVEY MCCOY; RON BYFORD, Plaintiffs-Appellants,
v.
LAS VEGAS SANDS, INC., dba Sands Hotel Casino, Defendant-Appellee.
LOCAL JOINT EXECUTIVE BOARD OF CULINARY/BARTENDER TRUST FUND; BARTENDERS UNION, LOCAL 165; CULINARY WORKERS UNION, LOCAL 226; HARVEY MCCOY; RON BYFORD, Plaintiffs-Appellees,
v.
LAS VEGAS SANDS, INC., dba Sands Hotel Casino, Defendant-Appellant.
 No. 98-17065, 98-17322
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted February 14, 2000
Filed April 11, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Andrew J. Kahn, McCracken, Stemerman, Bowen & Holsberry, Las Vegas, Nevada, for the plaintiffs-appellants-crossappellees.
 David N. Frederick, Lionel, Sawyer & Collins, Las Vegas, Nevada, for the defendant-appellee-cross-appellant.
 Appeal from the United States District Court for the District of Nevada Philip M. Pro, District Judge, Presiding. D.C. No.CV-96-00755-PMP/LRL, D.C. No.CV-96-00755-PMP/LRL
 Before: Alex Kozinski, Ferdinand F. Fernandez, and William A. Fletcher, Circuit Judges.
 W. FLETCHER, Circuit Judge:
 
 
 1
 Las Vegas Sands, Inc. ("Sands") violated the Worker Adjustment Retraining and Notification Act ("WARN Act" or "Act"), 29 U.S.C. SS 2101-2109, by giving its employees 45 rather than 60 days advance notice of the closure of its hotel casino in Las Vegas. The Local Joint Executive Board of Las Vegas ("the Union") and two individual representatives of nonunion employees sued for damages under the Act. Sands does not dispute that it violated the Act and must pay damages, but it contends that payments it made shortly after the closure satisfy its statutory obligations. On cross-motions for summary judgment, the district court granted partial summary judgment to both sides. Both sides appeal.
 
 
 2
 We affirm all the substantive decisions of the district court on issues of federal law.[1] We hold that under 29 U.S.C. S 2104(a)(1)(A) tip income is included within the definition of "back pay" to which employees are entitled, and that employees who can prove that they would have worked on a holiday are entitled to back pay at the rate they would have been paid for that holiday. Further, we hold that under S 2104(a)(2)(B) payments made to nonunion employees on the condition that they not quit before the date of the closure are not "voluntary and unconditional payment[s]" that Sands may deduct from its WARN Act damages, and that payments made to union employees pursuant to a bargained-for Memorandum of Agreement are also non-deductible "voluntary and unconditional payment[s]."
 
 
 3
 We reverse one procedural decision. We hold that the district court erred in denying class certification to the would-be class of nonunion employees.
 
 
 4
 * On May 15, 1996, Sands informed its employees that it would close its hotel casino on June 30, 1996. By providing only 45 days notice of the termination, rather than the 60 days required by the WARN Act, Sands became liable to each employee for "back pay" for the remaining 15-day period. See 29 U.S.C. SS 2102 2104.
 
 
 5
 In a June 4, 1996 letter, Sands offered severance pay to some nonunion employees who would lose their jobs because of the closure. Under the terms of the letter, Sands would pay more than the WARN Act required to nonunion employees with more than five years service, subject to the condition that they remain at work until the actual closure. The letter did not offer anything to union employees because severance pay is a mandatory subject of bargaining. See Kirkwood Fabricators, Inc., v. NLRB, 862 F.2d 1303, 1306-7 (8th Cir. 1988). After engaging in collective bargaining, Sands and the Union signed a Memorandum of Agreement ("MOA") on July 3, 1996, three days after the closure. The MOA provided that union employees would receive the same severance payments that the June 4th letter had offered to nonunion employees.
 
 
 6
 On June 30, 1996, Sands closed its hotel casino. On July 18, Sands paid its former employees what it deemed to be their WARN Act damages. In calculating damages, Sands compensated employees for working days rather than calendar days that fell within the 15-day period. Sands did not include in its calculations the tips the employees would have earned during the 15-day period of inadequate notice. Sands also did not include double time pay for those employees who would have worked on the July 4th holiday, even though employees working on that day would have been paid that additional amount. Sands paid both union and nonunion employees with more than five years service the severance promised in the June 4th letter and the MOA. Although Sands did not normally provide prorated vacation pay for nonunion employees who quit or were discharged prior to their service anniversary, it made prorated payments to those employees.
 
 
 7
 The Union, on behalf of its members, and individual plaintiffs, on behalf of a would-be class of nonunion employees, sued Sands for damages under the WARN Act.
 
 II
 
 8
 The WARN Act provides that employers within the scope of the Act "shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." 29 U.S.C. S 2102(a). Employers who violate the Act by failing to provide timely noticeshall be liable to each aggrieved employee . . . for
 
 
 9
 (A) back pay for each day of violation at a rate of compensation not less than the higher of
 
 
 10
 (i) the average regular rate received by such employee during the last 3 years of the employee's employment; or
 
 
 11
 (ii) the final regular rate received by such employee . . . .
 
 
 12
 29 U.S.C. S 2104(a)(1) (emphasis added).
 
 
 13
 When construing statutory language, we look first to its plain meaning. See Sacramento Reg'l County Sanitation Dist. v. Reilly, 905 F.2d 1262, 1268 (9th Cir. 1990). If the term at issue has a settled meaning, we infer that Congress meant to incorporate that meaning unless other language in the statute compels a contrary meaning. See American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982). If alternative readings are possible, we determine "whether one construction makes more sense than the other as a means of attributing a rational purpose to Congress." Longview Fibre Co. v. Rasmussen, 980 F.2d 1307, 1311 (9th Cir. 1992); see Sacks v. Commissioner, 69 F.3d 982, 992 (9th Cir. 1995). "Absent a clearly expressed legislative intention to the contrary," the language of the statute is "regarded as conclusive." Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).
 
 
 14
 In an earlier case brought under the WARN Act, we wrote that "[t]he term back pay has traditionally been understood to mean a sum equal to what [workers] normally would have earned had the violation not occurred." Burns v. Stone Forest Indus. Inc., 147 F.3d 1182, 1185 (9th Cir. 1998) (internal quotation omitted). However, we have never, before this case, had occasion to decide the specific issue of whether tips and vacation pay are included within the term "back pay" as used in the WARN Act.
 
 
 15
 As used in other federal statutes,"back pay" consistently includes tips. See, e.g., NLRB v. Lee Hotel Corp., 13 F.3d 1347, 1348, 1351 (9th Cir. 1994) (approving inclusion of tips in back pay calculation under the National Labor Relations Act ("NLRA"), 29 U.S.C. SS 151-169); Hilton Int'l Co. v. Union de Trabajadores de La Industria Gastronomica de Puerto Rico, 600 F. Supp. 1446, 1451 (D.P.R. 1985) ("tips are considered wages, part of [a worker's] compensation . . . and [are] properly included in a back pay award " for breach of a collective bargaining agreement under the NLRA (citations omitted)); In re Club Troika, Inc., 2 NLRB 90, 94 (1936) (noting that, under the NLRA, "in order that the discharged employees may be `made whole' the term `back pay' must . . . be regarded as including both the wage paid and the tips received"); Jackson v. McCleod, 748 F. Supp. 831, 836 (S.D. Ala. 1990) (including tips in the calculation of back pay under 42 U.S.C. S 1981).
 
 
 16
 As used in other federal statutes,"back pay" also includes holiday and overtime pay. See, e.g., Nichols v. Frank, 771 F. Supp. 1075, 1079 (D. Or. 1991) (taking into account nightand weekend-shift differentials in back pay calculation under Title VII of the Civil Rights Act of 1964), aff'd in Nichols v. Frank, 42 F.3d 503, 516 (9th Cir. 1994)); see also Pettway v. American Cast Iron Pipe Co., 494 F.2d 211, 263 (5th Cir. 1974) (finding under Title VII that "the ingredients of back pay should include more than`straight salary' ": "Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay."); Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1562 (11th Cir. 1986) (same); Meadows v. Ford Motor Co., 510 F.2d 939, 947 (6th Cir. 1975) (same); Minette Mills, Inc., 316 N.L.R.B. 1009, 1013 (1995) (affirming inclusion of credit for paid holidays in back pay calculation under NRLA); Kossman v. Calumet County, 849 F.2d 1027, 1033 (7th Cir. 1988) (affirming inclusion of overtime pay in back pay calculation under Age Discrimination in Employment Act).
 
 
 17
 Sands contends that the term back pay is not used in its normal sense in the WARN Act. It argues that WARN Act damages are a penalty designed to deter future violations, rather than the traditional labor relations make-whole remedy designed to compensate employees for their losses, and that "back pay" under the WARN Act therefore includes neither tips nor holiday pay that an employee would have received if he or she had worked during the period of a WARN Act violation.
 
 
 18
 * Sands urges us not to look to other federal statutes but to other provisions of the WARN Act. Under 29 U.S.C. S 2104(a)(1)(A)(i) and (A)(ii), the Act establishes a floor for damages, using either an average rate of compensation for thelast three years or a final regular rate of compensation, whichever is higher. Sands argues from subsections (A)(i) and (A)(ii) that "back pay" under the Act is not the amount the employee actually would have earned during the period of violation. We disagree. The Act states that an employer is liable for back pay at a rate not less than the higher of the calculations specified in subsections (A)(i) and (A)(ii). These subsections do not define "back pay"; rather, they establish a floor for WARN Act damages, thereby preventing employers from lowering wages shortly before closure in order to diminish their WARN Act liability.
 
 
 19
 Sands also argues that the Act lacks a key feature of classic back pay provisions: an offset for other earnings received during the period for which back pay is owed. See, e.g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 197 (1941) (defining back pay under the NLRA as "a sum equal to what[the employees] normally would have earned from the date of discrimination to the time of employment less their earnings during this period" (emphasis added)). According to Sands, if Congress had meant for WARN Act damages to compensate employees for actual lost earnings, it would have allowed a deduction for other earnings. However, we are more persuaded by the reasoning of the Fifth Circuit:
 
 
 20
 There are plausible reasons why Congress could choose not to include a provision that would make the WARN compensation provisions purely remedial, e.g., the desire to avoid placing a burden on a terminated employee to mitigate damages by taking any job offered, the desire to give a terminated employee a window of time to readjust without immediately having to search for a job, the desire for simplicity in the statutory scheme, etc.
 
 
 21
 Carpenters District Council of New Orleans v. Dillard Dep't Stores, Inc., 15 F.3d 1275, 1284 n.14 (5th Cir. 1994); accord Saxion v. Titan-C-Mfg., Inc., 86 F.3d 553, 560 (6th Cir. 1996) (quoting Dillard).
 
 B
 
 22
 We believe that the normal meaning of back pay is consistent with the overall purpose of the WARN Act. See United States v. Hanousek, 176 F.3d 1116, 1120 (9th Cir. 1999), cert. denied, 528 U.S. 1102 (2000) ("Particular phrases must be construed in light of the overall purpose and structure of the whole statutory scheme.") (quoting United States v. Lewis, 67 F.3d 225, 228-29 (9th Cir. 1995)). We have previously held that the Act "is a wage worker's equivalent of business interruption insurance [that] protects a worker from being told on payday that the plant is closing that afternoon and his streamof income is shut off." Burns, 147 F.3d at 1184. A "stream of income" does not distinguish among sources of that income. Whether an employee's income is paid by the employer or by tipping customers, or whether it is regular or holiday pay, it is all part of an employee's "stream of income."
 
 
 23
 The conclusion that the WARN Act was intended to provide "workers . . . what they would have earned in the two-month notice period, were there no shutdown" led us to hold in Burns that workers should be compensated for work days in the violation period, not calendar days. Burns, 147 F.3d at 1184 (noting that the work-day approach "serves the statutory purpose of providing a two-month uninterrupted income stream facilitating a job search"). The Fifth and Sixth Circuits have come to the same conclusion. See Dillard , 15 F.3d at 1283; Saxion, 86 F.3d at 560. But see United Steelworkers of America v. North Star Steel Co., 5 F.3d 39, 42-43 (3d Cir. 1993) (concluding that "WARN uses the term `back pay' simply as a label to describe the daily rate of damages payable" and thus calendar days, not work days, are the appropriate damages benchmark).
 
 
 24
 While some provisions of the Act are punitive in nature, the primary purpose of the Act is remedial. Among other things, we note that the Act waives a $500 per day penalty otherwise owed by the employer to the government if the employer pays laid-off employees their "back pay " under the WARN Act within three weeks of the ordered layoff. See 29 U.S.C. S 2104(a)(3). Congress was clearly concerned with ensuring an income stream, or, in the words of the governing regulation, with "provid[ing] protection to workers, their families and communities." 20 C.F.R. S 639.1(a). Indeed, the Senate report on the "Economic Dislocation and Worker Adjustment Assistance Act," from which WARN's provisions were ultimately severed and separately enacted, explicitly stated that the Act's purpose was to "assur[e ] the most rapid possible readjustment and retraining of displaced workers" and to "eas[e] the personal and financial difficulties for workers who must make these transitions." S. Rep. No. 100-62, at 3 (1987).
 
 C
 
 25
 Because "back pay" under the WARN Act is a makewhole compensatory remedy, damages under the Act should compensate employees for the money they would have earned but for the premature closure in violation of the WARN Act. We therefore hold that Sands must pay its employees, as WARN Act damages, not only what Sands would have paid them directly but also what they would have received in tips. For the same reason, we also hold that Sands must pay employees who would have worked on July 4th the amount they would have earned on that day.
 
 
 26
 Individual employees must, of course, be able to prove the amount of tips they would have received. Similarly, they must be able to prove that they would have worked on July 4th. We are unable to determine on this record how difficult such proof will be, but we wish to make clear that both are matters to be proved rather than assumed.
 
 III
 
 27
 The WARN Act allows an employer to reduce its liability under the Act by "any voluntary and unconditional payment by the employer to the employee that is not required by any legal obligation." 29 U.S.C. S 2104(a)(2)(B). Sands contends that this provision allows it to deduct the severance payments made to nonunion employees under the terms of its June 4th letter, and to its union employees under the terms of the July 3rd MOA. We agree with the district court that the payments were not voluntary and unconditional and that they are thus not deductible.
 
 
 28
 Sands' June 4th letter offered severance payments to nonunion employees with over five years experience, but only on the condition that the employees remain on the job until the hotel casino closed. The letter constituted an offer under Nevada law. See Las Vegas Hacienda, Inc. v. Gibson, 359 P.2d 85, 86 (Nev. 1961) (stating Nevada law). An offeree's performance in return for what is offered constitutes consideration, and an enforceable contract results from that performance. See id. Sands' nonunion employees accepted Sands' offer and provided consideration by working until the hotel casino closed. After performance by the nonunion employees, Sands had a legal obligation to make the severance payments promised in the June 4th letter. Because the payment was obligatory, Sands was not entitled to any deduction from its WARN Act liability under S 2104(a)(2)(B). See Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 144, 152 (3d Cir. 1998) (holding that ERISA payments employer was legally obliged to pay were not voluntary and unconditional under the WARN Act).
 
 
 29
 Sands could not unilaterally offer its union employees the terms of the severance pay it offered its nonunion employees. Rather, it was required to bargain with the Union over those terms. Sands and the Union concluded their MOA on July 3, 1996, three days after the hotel casino closed. Because the MOA was not signed until after the closure, the union employees necessarily did not provide consideration by remaining on the job through the closure. It does not follow, however, that there is no enforceable legal obligation. As the parties concede, the MOA is a legally binding collective bargaining agreement, even in the absence of conventional consideration. See Certified Corp. v. Hawaii Teamsters & Allied Workers, Local 996, 597 F.2d 1269, 1271 (9th Cir. 1979)(noting that courts have held that "consideration is not necessary to make a collective bargaining agreement enforceable" (citation omitted)).
 
 
 30
 Sands also seeks to deduct, pursuant to 28 U.S.C. S 2104(a)(2)(B), payments to terminated nonunion employees for accrued vacation time. We agree with the district court that these payments should not have been deducted. Payment for accrued vacation time is commonly considered a form of deferred compensation. For example, "Courts have held . . . that vacation pay, provided upon fulfillment of specific work requirements, can constitute deferred compensation, due even after expiration of a collective bargaining agreement." Upshur Coals Corp. v. United Mine Workers of America, Dist. 31, 933 F.2d 225, 229 (4th Cir. 1991) (collecting cases). We agree with the district court that Nevada courts would likely conclude that Sands had a legal obligation under Nevada law to pay for vacation time that had accrued from work already performed, even for employees who had not reached the anniversary date of their employment. As the district court explained, the employees' failure to reach the anniversary date was excused, and the employer's obligation to pay was triggered, by the fact that Sands prevented the employees' performance by closing their workplace. See Cladianos v. Friedhoff, 240 P.2d 208, 210 (Nev. 1952) (stating that when a promisor himself prevents performance, that performance is excused).
 
 IV
 
 31
 Individual plaintiffs Harvey McCoy and Ron Byford appeal the district court's refusal to certify a class of between 162 and 215 nonunion employees under Federal Rule of Civil Procedure 23(b)(3). We conclude that the district court erred in denying class certification.
 
 
 32
 * We first address the standard under which we review the district court's decision. The district court initially denied, without explanation, McCoy and Byford's class certification motion on November 18, 1997. In response to a request by the parties, the district court issued an order on October 15, 1998, stating in its entirety:
 
 
 33
 The reasons for denying Plaintiffs' Motions for Class Certification in the Order of November 18, 1997, were as follows:
 
 
 34
 1. The Court concluded that Plaintiffs had failed to demonstrate the predominance of common questions of law and fact in accord with Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure;
 
 
 35
 2. The Court concluded on the basis of the authorities and evidence presented by the parties that Plaintiffs failed to demonstrate that a class action afforded a superior format for the resolution of Plaintiffs' claims.
 
 
 36
 3. The Court found that because there was no basis for concluding that this was a "limited fund" case, there was no justification for class certification under Fed. R. Civ. P. 23(b)(1)(B).
 
 
 37
 4. Finally, the Court concluded that neither Plaintiffs McCoy nor Beyford had demonstrated that they were adequate class representatives in this particular case.
 
 
 38
 We ordinarily review a district court's class certification decision for abuse of discretion. See Knight v. Kenai Peninsula Borough Sch. Dist., 131 F.3d 807, 816 (9th Cir. 1997); Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1233-34 (9th Cir. 1996). "If the trial judge has made findings as to the provisions of the Rule and their application to the case, his determination of class status should be considered within his discretion." Clark v. Watchie, 513 F.2d 994, 1000 (9th Cir. 1975) (citations omitted). However, when a district court's decision is not "supported by findings as to the applicability of Rule 23 criteria," it is not entitled to the traditional deference given to such a determination. Gibson v. Local 40, Supercargoes & Checkers of Int'l Longshoremen's & Warehousemen's Union, 543 F.2d 1259, 1263 n.2 (9th Cir. 1976); Price v. Lucky Stores, Inc., 501 F.2d 1177, 1179-80 (9th Cir. 1974) (vacating and remanding for reinstatement of class status), disapproved on other grounds in Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 479 n.2 (1978); see also Inda v. United Air Lines, Inc., 565 F.2d 554, 563 (9th Cir. 1977) (remanding for a "sufficiently explicit order").
 
 
 39
 It is clear that the district court's November 18, 1997, order did not satisfy the requirement of Clark, Gibson and Price. The more difficult question is whether the district court's October 15, 1998 order did so. The four operative sentences of the October 15 order paraphrase four provisions of Rule 23 and indicate the court's conclusion that those provisions were not satisfied. These sentences, however, do not explain why the court concluded that the provisions were not satisfied on the facts of this case. That is, in the words of Clark, the district court "made findings as to the provisions of the Rule," but made no findings as to "their application to the case." 513 F.2d at 1000. We thus do not have the findings necessary to which we may give the normal deference accorded to class determinations. See Gibson, 543 F.2d at 1263 n.2. However, we believe that the factual record is sufficiently well developed that we may evaluate for ourselves whether the provisions of Rule 23 have been satisfied, and that we therefore donot need to remand for a determination of class action status. Compare id. at 1264 ("Since the trial has been completed and a full record is before us, it is appropriate that we determine whether the action is to be maintained as a class action.").
 
 B
 
 40
 Plaintiffs sought certification as a "damages " class action under Rule 23(b)(3) or, alternatively, as a "common fund" class action under Rule 23(b)(1). We agree with the district court that this action is unsuited for common fund certification. See Ortiz v. Fibreboard Corp., 527 U.S. 815, 838-40 (1999). However, we find insufficient grounds in the record to support a denial of certification of a "damages" class action under Rule 23(b)(3). We discuss the district court's three bases for denying certification of such a class in the following order: (1) the adequacy of the would-be class representatives, as required by Rule 23(a)(4); (2) the predominance of common questions of law or fact, as required by Rule 23(b)(3); and (3) the superiority of a class action to other methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3).
 
 
 41
 * Rule 23(a)(4) requires that "the representative parties [must] fairly and adequately protect the interests of the class." "Adequate representation `depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.' " Crawford v. Honig, 37 F.3d 485, 487 (9th Cir. 1995) (quoting Brown v. Ticor Title Ins. Co., 982 F.2d 386, 390 (9th Cir. 1992)). The district court stated that "neither . . . McCoy nor Byford . . . demonstrated that they were adequate class representatives in this particular case." We believe that this conclusion is not supported by the record as to McCoy.[2] McCoy worked as a dealer for Sands until it closed on June 30, 1996. Like other members of the proposed class of dealers, he received the sort of post-termination payment from Sands that we hold to have been insufficient under the WARN Act.
 
 
 42
 Sands emphasizes that, at the outset of the litigation, McCoy declined to be a class representative. McCoy testified in his deposition that he initially declined to represent the class because he was unemployed and feared being blackballed by Nevada employers. Notwithstanding this fear, however, he contacted counsel, organized his co-workers, galvanized support for proceeding collectively, and spearheaded the meeting at which the initial class representative, Joseph Tortomas, volunteered to represent his fellow dealers. When Tortomas became unable to serve because of health problems, McCoy had found a job in another state and agreed to represent the class. We do not believe that the record supports a conclusion that McCoy is either unwilling or unable to serve as a class representative. The record indicates clearlythat he understands his duties and is currently willing and able to perform them. The Rule does not require more.
 
 
 43
 The competence of counsel seeking to represent a class is also an appropriate consideration under Rule 23(a)(4). See Crawford, 37 F.3d at 487. Would-be class counsel in this case are labor lawyers experienced in class actions, and the record does not support a finding that they do not satisfy the requirements of the Rule.
 
 2
 
 44
 Rule 23(b)(3) requires that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).[3] "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997) (citation omitted).
 
 
 45
 In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis.
 
 
 46
 Hanlon v. Chrysler Corp., 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation omitted).
 
 
 47
 Here, as in Hanlon, "[a] common nucleus of facts and potential legal remedies dominates this litigation. " Id. Members of the putative class were all terminated on the same day with the same inadequate notice. All would-be class members share a common interest in three issues we heard on appeal in this case: (1) whether "back pay" under the WARN Act includes tips; (2) whether Sands is entitled to deduct severance payments from its WARN Act liability; and (3) whether Sands' mid-July wage payments to nonunion employees were timely under Nevada law.[4]
 
 
 48
 Individualized issues are few, and most of them are likely to be relatively easy. For example, the damages for individual class members will entail a straightforward calculation of which days and how many hours they would haveworked, and how much they would have earned in tips. Because dealers' tips were counted and divided in the casino cashier's cage, Sands has detailed written records of the tips employees earned in the past. Because Sands required its dealers to pool tips, there is no variation in tip earnings based on individual performance. We recognize that there may be some variation among the individual employees, as well as some potential difficulty in proof, in demonstrating that they would have worked on July 4th. But given the number and importance of the common issues, we do not believe that this variation is enough to defeat predominance under Rule 23(b)(3).
 
 3
 
 49
 A Rule 23(b)(3) class action must also be "superior to other available methods for the fair and efficient adjudication of the controversy." Rule 23(b)(3) provides a non-exhaustive list of factors to consider in determining superiority:
 
 
 50
 (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.
 
 
 51
 Id. The district court's order did not mention any of these factors. Our own analysis convinces us that none weighs against class certification.
 
 
 52
 This case involves multiple claims for relatively small individual sums. Counsel for the would-be class estimated that, under the most optimistic scenario, each class member would recover about $1,330. If plaintiffs cannot proceed as a class, some--perhaps most--will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover. "Class actions . . . may permit the plaintiffs to pool claims which would be uneconomical to litigate individually." Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985); see also 7A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure S 1779 (2d. ed. 1986) ("[I]f a comparative evaluation of other procedures reveals no other realistic possibilities, this [superiority ] portion of Rule 23(b)(3) has been satisfied.").
 
 
 53
 Moreover, members of the would-be class appear to agreewith the choice to litigate as a class. Three would-be class members--Earl Hill, Earl Chew, and Candy Vasco-explicitly stated that they wished to be represented by McCoy and Byford. No would-be class member has expressed a desire to proceed independently. From the record before us, there appear to be no individual actions now pending, and no unusual obstacles that would make managing the class particularly difficult.
 
 
 54
 On the facts of this case, we conclude that the superiority requirement of Rule 23(b)(3) is easily satisfied.
 
 C
 
 55
 We are unable on the present record to determine all issues relevant to class certification. For example, the parties disagreed in the district court over the precise definition of the class. Because the district court refused to certify the class at all, it did not resolve this disagreement. Further, it is possible that other class representatives, in addition to McCoy, might be necessary to represent the full range of interests among the class members. We leave these and other issues that might need further development to be addressed by the district court on remand.
 
 V
 
 56
 For the foregoing reasons, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings not inconsistent with this opinion. Costs on appeal shall be divided between defendant and the plaintiffs.
 
 
 
 Notes:
 
 
 [1]
 However, we affirm in part and reverse in part the district court's substantive holdings on issues of state law, which we discuss in a separate unpublished memorandum disposition filed simultaneously with this opinion.
 
 
 [2]
 Because the adequacy-of-representation requirement is satisfied as long as one of the class representatives is an adequate class representative,we do not address the adequacy of Byford. See Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123, 128 (3d Cir. 1987), rev'd in part on other grounds, Reed v. United Transp. Union, 488 U.S. 319 (1989).
 
 
 [3]
 The district court's order states that the class fails to satisfy the predominance requirement of Rule 23(a)(2) as well as that of Rule 23(b)(3). Rule 23(a)(2) requires only that there be common questions of law or fact. It has no predominance requirement. See Fed. R. Civ. P. 23(a)(2).
 
 
 [4]
 We address the third issue in our separate unpublished memorandum disposition.